Edward B. BENJAMIN, Plaintiff-Appellee,

v.

WESTERN BOAT BUILDING CORPORATION, Defendant-Third-Party Plaintiff-Appellant,

v.

Roger McALEER, Third-Party Defendant-Appellee.

No. 72–1058.

United States Court of Appeals, Fifth Circuit.

Jan. 26, 1973.

Rehearing and Rehearing En Banc Denied March 15, 1973.

---

5. See 8 C.F.R. § 242.1 which was adopted by 22 Fed.Reg. 9796, December 6, 1957.

Lawrence L. McNamara, Hendrik Uiterwyk, New Orleans, La., for plaintiff-appellant.

William A. Porteous, III, New Orleans, La., for Edward B. Benjamin.

Alan Y. Cole, Washington, D. C., Gerard H. Schreiber, New Orleans, La., for third-party defendant-appellee.

Before RIVES, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

In this Louisiana diversity case, we are asked to determine whether the District Court was correct in asserting *in personam* jurisdiction over the defendant, and in denying *in personam* jurisdiction over the third-party defendant, under the state "long-arm" statute. Because we hold that the in-state activity of neither defendant was sufficient to satisfy the "minimum contacts" requirement of constitutional due process, we reverse the assertion of *in personam* jurisdiction over the defendant and affirm

the dismissal of the third party complaint.

Edward B. Benjamin, a resident of Louisiana, sued Western Boat Building Corporation, a Washington corporation, for an alleged breach of contract in the construction of Benjamin's 53 foot auxiliary yawl INDRA IV. After the District Court denied Western Boat's motion to dismiss for lack of *in personam* jurisdiction, Western Boat filed a third party complaint against the vessel's designer Robert W. McAleer, a naval architect in Alexandria, Virginia. The District Court dismissed the third party complaint for lack of *in personam* jurisdiction over McAleer. Western Boat appeals both rulings. It took an appeal as of right from the final judgment dismissing McAleer, and the District Court certified for interlocutory appeal the question of its jurisdiction over Western Boat. 28 U.S.C.A. § 1292(b).

Although the Louisiana "long-arm" statute, LSA–R.S. 13:3201, is pertinent because Rules 4(d)(7) and 4(e) of the Federal Rules of Civil Procedure permit service of process in accordance with the law of the state in which the District Court sits, we do not decide this case under the Louisiana law. Instead, we posit this decision on the failure of the exercise of *in personam* jurisdiction to meet the due process standard required by the United States Constitution. Our decision would appear to violate the usually sound practice of refusing to reach constitutional questions if a case can be decided on nonconstitutional grounds. *See, e. g.*, Burton v. United States, 196 U.S. 283, 25 S.Ct. 243; 49 L. Ed. 482 (1905); Texas v. Grundstrom,

404 F.2d 644 (5th Cir. 1968). But we find our approach to be the better part of discretion here because it is unclear whether the Louisiana statute was intended to go to the permissible limits of due process in the exercise of *in personam* jurisdiction in contract cases, and we think that good federalism requires us to refrain from making law for Louisiana in this regard.[1] Moreover, the case can be disposed of readily on the constitutional ground, on the authority of existing decisions, without creating any new constitutional law.

## CONSTITUTIONAL STANDARD

██ There is no objective test by which to judge the facts of a particular case to determine if the assertion of *in personam* jurisdiction exceeds the limits of constitutional due process. Although the jurisdictional theory of Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1878), required some personal presence within the territorial jurisdiction of a court to support a personal judgment, that theory was drastically changed by International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *International Shoe* held that due process requires only that the defendant have sufficient contacts with the forum state to permit the suit to be maintained without offending traditional notions of fair play and substantial justice. Later Supreme Court cases have failed to develop any precise standard as to what those "minimum contacts" must be. *See* Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

---

1. No Louisiana case has explicitly articulated a distinction between contract and tort cases under the "long-arm" statute, but one Louisiana commentator has argued that the practice of Louisiana courts indicates a narrower scope for the statute in contract cases, a scope that does not extend to the outer limits permitted by the Constitution. *See* Lewis, Suing a Nonresident—The Reach of Louisiana's Long-Arm Statute, 19 La.B.J. 205 (1971). Recent Louisiana decisions may support such a view. *See, e. g.*, Riverland Hardwood Co. v. Craftsman Hardwood Lumber Co., 259 La. 635, 251 So.2d 45 (1971); Bowlero, Inc. v. Allen, 205 So.2d 196 (La.App.1967); Moore v. Evans, 196 So. 2d 839 (La.App.1967), writ refused, 250 La. 895, 199 So.2d 914 (1967); Fidelity Credit Co. v. Bradford, 177 So.2d 635 (La.App.1965), writ refused, 248 La. 430, 179 So.2d 273 (1965). We do not consider the question.

Analysis of our own cases reveals that, while very little purposeful activity within a state is necessary to satisfy the minimum contacts requirement, we have, nevertheless, unequivocally required *some* activity by the defendant before permitting the exercise of *in personam* jurisdiction under a state "long-arm" statute, the jurisdictional touchstone being the presence of sufficient in-state business activity to indicate a purposeful enjoyment of the benefits and protections of that state's law. For example, in Eyerly Aircraft Co. v. Killian, 414 F.2d 591 (5th Cir. 1969), this Court decided that due process requirements did not prevent a Federal District Court in Texas from exercising *in personam* jurisdiction, under the Texas "long-arm" statute, over the nonresident manufacturer of an allegedly defective amusement ride, called a Rock-O-Plane, the operation of which had caused a personal injury in Texas. The manufacturer, an Oregon corporation, had sold the ride to an itinerant amusement company almost twenty years before the Texas accident. The *Eyerly Aircraft* decision sustained *in personam* jurisdiction on two grounds: First, the defendant manufacturer Eyerly Aircraft had introduced the Rock-O-Plane into the stream of interstate commerce with reason to know or to expect that the ride would eventually be brought to Texas. Second, Eyerly Aircraft had direct contacts with Texas in the form of substantial and continuing business relations with Texas firms. Among these contacts were (1) sales and deliveries of amusement devices and parts directly into the state; (2) the extension of credit in the state; (3) the retention of liens on items sold; (4) the filing of such liens with state and county authorities; (5) the servicing of machines in the state; and (6) the solicitation of business in the state. The *Eyerly Aircraft* Court characterized these contacts as "neither occasional nor sporadic," but rather as "continuous and substantial." 414 F.2d at 594–595.

Subsequent to *Eyerly Aircraft,* this Court approved "long-arm" jurisdiction resting upon a "stream of commerce" theory. In Coulter v. Sears, Roebuck & Co., 426 F.2d 1315 (5th Cir. 1970), the Texas plaintiffs had purchased a television set from Sears in Lubbock, Texas. After it allegedly burst into flames and partially destroyed their home, they sued Sears in Texas. Sears filed a third party complaint against the manufacturer of the television, Warwick Electronics, Inc., a Delaware corporation having its principal place of business in Chicago, Illinois. The District Court granted Warwick's motion to dismiss the third party complaint for want of *in personam* jurisdiction but this Court reversed. We held that the minimum contacts requirement was satisfied by Warwick's "direct and substantial" contacts with Texas through its television sets. Although Warwick was not authorized to do business in Texas and did not maintain a regular place of business in that state, its contact with the Lone Star State was the presence within the state of a substantial number of its television sets. The plaintiffs' television had followed a marketing route defined by a pattern of distribution established over a long period of time. Warwick had sold its television sets knowing that Sears resold a substantial number of them in Texas, so Warwick had purposefully enjoyed the benefits of the Texas market and the protections of that state's laws.

Thus, in both *Eyerly* and *Coulter,* substantial activity within the forum state satisfied the minimum contacts requirement of constitutional due process.

Where the requisite contacts are not present, however, this Court has unhesitatingly prohibited the exercise of *in personam* jurisdiction. For example, in Buckley v. New York Times Co., 338 F. 2d 470 (5th Cir. 1964), a Louisiana plaintiff sued the New York Times and several other major newspapers for libel. The District Courts dismissed the suits for lack of *in personam* jurisdiction, and

this Court affirmed. We there held that, singly or in combination, the mere circulation of a periodical through the mails to subscribers and independent distributors, sporadic news gathering by reporters on special assignment, and the solicitation of a small amount of advertising constitute neither doing business nor engaging in a business activity. The Court further stated in *Buckley* that such a "casual presence" in the forum state was "not enough to make it reasonable and just, and in conformity with the due process requirements of the Fourteenth Amendment, for the State of Louisiana to enforce against them obligations arising out of such activities." 338 F.2d at 475.

In Hamilton Brothers, Inc. v. Peterson, 445 F.2d 1334 (5th Cir. 1971), a Florida corporation sued a Mexican resident on a contract for the sale of a vessel that had run aground off the coast of Mexico. Defendant Peterson had telegraphed an offer from Mexico to the vessel's Florida owners, and the offer had been accepted by return telegram sent from Florida. When Peterson later refused to complete the sale, the owners sued him in Florida for specific performance. The District Court denied Peterson's motion to dismiss for lack of *in personam* jurisdiction, but this Court reversed. Acknowledging that the Florida "long-arm" statute should be construed as broadly as is consistent with due process, the Court nevertheless held that Peterson had not had the requisite minimum contacts with Florida and that maintenance of the action would offend traditional notions of fair play and substantial justice. *See also* Florida Towing Corp. v. Oliver J. Olson & Co., 426 F.2d 896 (5th Cir. 1970).

The most recent case in this Circuit to consider the minimum contacts requirement, Owen of Georgia, Inc. v. Blitman, 462 F.2d 603 (5th Cir. 1972), reaffirmed our reluctance to uphold *in personam* jurisdiction where the nonresident defendant has not purposefully enjoyed the benefits and protections of the forum state's law. *Blitman* was a suit by a Georgia plaintiff against Massachusetts defendants for alleged breach of an oral contract. The plaintiff, a Georgia steel fabricator, had been contacted by another Massachusetts corporation, Design Structures, Inc., and informed that the defendants' Boston construction project required certain fabricated materials. A representative of the plaintiff then traveled to Massachusetts, met with representatives of the defendants, and allegedly entered into an oral agreement for the necessary steel fabrication to be performed in the plaintiff's Georgia factory. This Court held that the defendants had simply not had sufficient contacts with the State of Georgia to satisfy constitutional due process standards. We did not reach the question of whether the contacts would have been sufficient had Design Structures, Inc., acted as the defendants' agent in soliciting the plaintiff, because the plaintiff had failed to establish the agency relationship.

■ Against the background of these cases, we have examined the facts in the case before us and have concluded that there is such an absence of contact by Western Boat with the territorial jurisdiction of Louisiana that the maintenance of a suit against it in Louisiana for a personal judgment offends "traditional notions of fair play and substantial justice."

## FACTS

In early 1957, Benjamin contacted McAleer and arranged to meet with him in Washington, D. C. Meeting as planned on March 5, 1957, they orally agreed that McAleer would design a new sailboat for Benjamin, produce construction specifications, take bids for the vessel's construction, make recommendations to Benjamin on those bids, and make several inspection trips to the boat builder's yard during construction.

After a year of design, McAleer requested a bid from Western Boat on August 28, 1958. Western Boat submitted a bid to McAleer in Alexandria, Virginia, on September 10, 1958, and sent a copy of the bid to Benjamin at his part-

time home in Greensboro, North Carolina. In reply, Western Boat received a letter from Benjamin dated September 22, 1958, written on stationery letterheaded "Edward B. Benjamin, Greensboro, N. C." This letter stated that Benjamin was forwarding four signed copies of the contract, and it requested return of the executed copies to him in Greensboro. On September 30, 1958, Western Boat accepted and executed the contract in Tacoma, Washington, when its officer signed and dated the contract. The same day, Western Boat mailed copies of the executed contract to Benjamin at Greensboro. On October 3, 1958, Benjamin sent a letter from Greensboro to Western Boat in Tacoma, acknowledging Western Boat's September 30 letter and receipt of the executed copies of the contract.

The contract itself called for construction of the vessel at Tacoma, Washington, in accordance with the plans and specifications to be furnished by McAleer. Benjamin was to furnish certain material for installation in the vessel at Tacoma, and inspections by Benjamin and by McAleer were to take place at Tacoma. Western Boat was to be paid in Tacoma, and Benjamin was to accept and to take delivery of the vessel at Tacoma.

After the contract had been executed, work on the vessel began immediately at Western Boat's yard at Tacoma. During construction, Benjamin, McAleer, and Western Boat communicated frequently, both by telephone and through written correspondence, about particulars of construction. Benjamin initiated nearly all of the correspondence, asking questions about the vessel's construction progress, inquiring about when his payments were due, telling of his planned usage of the vessel, and sometimes just giving his present location. One series of letters negotiated additional costs. Much of the correspondence originated from New Orleans, although a substantial volume was directed to Tacoma from such varied locations as Greensboro, North Carolina, Coconut Grove, Florida, and aboard ship.

In June, 1959, Western Boat invoiced Benjamin in Greensboro. Benjamin paid for the vessel with eight checks totalling $162,373.33, all but one of which were paid through a New Orleans bank. The single exception was a check for $35,000 drawn on a North Carolina bank.

In August, 1959, Benjamin traveled to Tacoma, where he accepted delivery and took physical possession of the vessel. He sailed it on the West Coast and shipped it from San Francisco to Tampa, Florida. The vessel was homeported in New Orleans where it immediately became a subject of widespread publicity in several yachting magazines enjoying national circulation.

Benjamin sailed his yacht for nearly ten years, apparently without complaint. In early January, 1969, Benjamin's maintenance crew discovered that the vessel's hull had corroded extensively. Benjamin contacted Western Boat, and a Western Boat employee suggested that he employ a particular Seattle firm to gauge the vessel's plating. Benjamin followed Western Boat's recommendation, and the Seattle firm performed the gauging in Louisiana. On June 3, 1969, Benjamin wrote to Western Boat complaining of alleged irregularities in the vessel's construction and inviting Western Boat to examine it in Louisiana. In response, Western Boat arranged for an independent Louisiana firm to inspect the INDRA IV. Benjamin filed suit against Western Boat on June 30, 1969, in both Louisiana and Washington. The District Court for the Western District of Washington dismissed Benjamin's suit as barred by the Washington statute of limitations.

## DECISION

In the case at bar, the District Court entered no specific written findings and reasoning when it denied Western Boat's motion to dismiss for lack of *in personam* jurisdiction, but, in its memorandum

opinion dismissing Western Boat's third party complaint against McAleer, the District Court did discuss briefly the reasons why it upheld jurisdiction over Western Boat. The District Court thought that Western Boat's advertising in media circulated in Louisiana, its warranty on repairs that foreseeably would be made in Louisiana, the repairs actually made in Louisiana and charged to Western Boat, the extensive communications and negotiations between Benjamin and Western Boat which emanated from and were received in Louisiana, and the commercial agreement with foreseeable economic effects in Louisiana together constituted sufficient "contacts" to sustain *in personam* jurisdiction.

On appeal, Benjamin has recast his argument to point up six sets of Western Boat "contacts" which, he argues, together satisfy the constitutional due process minimum contacts requirement: (1) preliminary negotiations, (2) the contract itself, (3) contacts subsequent to the execution of the contract, (4) place of enrollment (the home port) of the vessel, (5) publicity concerning the vessel and its manufacturer Western Boat, and (6) Western Boat's activities subsequent to Benjamin's notice that the vessel had manifested defects in construction. According to Benjamin, the totality of these contacts permits a Louisiana court to exercise *in personam* jurisdiction consistent with due process requirements. We disagree. Not even under the broadest interpretation of the due process minimum contacts requirement can Western Boat be found to have purposefully enjoyed the benefits and protections of Louisiana law.

Before examining Benjamin's six sets of "contacts," it is necessary to understand that these factors constitute the entire sum of Western Boat's contacts with Louisiana. Western Boat (1) is a corporation organized under the laws of Washington, (2) is not qualified to do business in Louisiana, (3) has neither incurred nor paid taxes to Louisiana, (4) has not appointed an agent for service of process in Louisiana, (5) has no office, no place of business, no officers, no agents, no employees, no salesmen, no licensees, no franchisees, and no distributors in Louisiana, (6) has no independent dealers in Louisiana, (7) has no assets in Louisiana, (8) has never advertised in local Louisiana media and is not listed in any Louisiana telephone directories, (9) has never delivered, or arranged to be delivered, a vessel of any kind in Louisiana, (10) has never made a sale to a resident of Louisiana, other than the sale to Benjamin, and (11) has never sent representatives, inspectors, or repair or service personnel to Louisiana. Therefore, Western Boat's Louisiana contacts are limited solely to those contacts generated in the course of the transaction with Benjamin.

The preliminary negotiations consisted of McAleer soliciting bids, on Benjamin's behalf, for the construction of the vessel. Western Boat sent its bid to Benjamin in North Carolina. Benjamin allegedly signed the contract in New Orleans and sent it to Western Boat in Tacoma. Several intervening letters from both parties accompanied the transaction. Without more, this series of letters and exchange of the contract cannot be characterized as purposeful activity invoking the benefits and protections of Louisiana's laws.

The contract was formed on September 30, 1958, when Western Boat accepted and executed in Tacoma the written agreement allegedly signed by Benjamin in New Orleans. The contract reemphasized the Washington locus of the transaction by calling for construction, inspection, and delivery of the vessel at Tacoma. The contract mentions Louisiana only with respect to Benjamin, describing him as a resident of New Orleans. Benjamin contends that the contract should be viewed as providing a basis for *in personam* jurisdiction through the substantial revenue it produced from Louisiana for Western Boat. According to Benjamin's theory, the Supreme Court acknowledged in *McGee, su-*

*pra,* that a single mail transaction could form the basis for *in personam* jurisdiction over a nonresident corporation, so therefore that reasoning should apply in this case to support jurisdiction. We disagree. *McGee* involved a transaction with a nonresident insurance company, and the sensitive nature of the insurance business lent additional weight to the Court's measure of the insurance company's contacts with the forum state. Moreover, *McGee* involved a fact situation substantially unlike the one in the case at bar, in that Benjamin initiated this transaction and consummated it when he accepted delivery of the vessel in Washington.

A major portion of Benjamin's argument focuses upon the communications between Benjamin and Western Boat during the period of time between the formation of the contract and the delivery date. Benjamin contends that these post-contract communications, some of which negotiated price and equipment adjustments, created business contacts for Western Boat in Louisiana. According to Benjamin, nearly 50 letters either originated from or were received in Louisiana from 1957 until 1969, with the bulk of them coming after the date on which the contract was made. We find this contention singularly unpersuasive. The great majority of the letters was written by Benjamin to Western Boat, and the Supreme Court stated very clearly in *Hanson* that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." 357 U.S. at 253, 78 S.Ct. at 1239.

As to the place of enrollment (the home port) of the vessel, Benjamin contends that Western Boat's knowledge that the vessel was to have its home port in Louisiana indicates that Western Boat was purposefully invoking the benefits and protections of Louisiana's law. This argument has three prongs:

First, Benjamin points out that Western Boat would have to file in New Orleans any liens that it had against the vessel, since New Orleans was its home port. Apart from whether Western Boat would have been invoking the protections of Louisiana law or of federal maritime law by filing a lien, the short answer to Benjamin's argument is that the contract required delivery of the vessel "free of liens of any kind" and Western Boat in fact never filed any such liens in New Orleans or anywhere else.

Second, Benjamin asserts that this Court's decision in Coulter v. Sears, Roebuck and Co., *supra,* permits a finding of *in personam* jurisdiction where the nonresident seller knew that his product was to be brought into the forum state. This reading of *Coulter* is too broad. To be sure, *Coulter* adopted a "stream of commerce" theory, but that decision also emphasized that the defendant nonresident manufacturer had supplied its product to the forum state in large quantities over a lengthy period of time. In contrast, the transaction between Western Boat and Benjamin was merely an isolated sale that took place in the State of Washington.

Third, Benjamin and the District Court rely heavily upon the contractual guarantees against defects in the vessel. The contract made Western Boat liable for defects that appeared during the six month period immediately following acceptance and delivery of the vessel. The District Court and Benjamin reason that, since Western Boat knew that the vessel was to have its home port in Louisiana, it knew that any repairs under the warranty would necessarily be made in Louisiana. Again, the short answer is that no such repairs were ever made in Louisiana by Western Boat.

Benjamin next asserts that Western Boat's advertising activity provides a small but weighty Louisiana "contact." He points to three separate kinds of advertising to illustrate how Western Boat was actively advertising to attract Louisiana customers. First, Benjamin produced a Christmas card sent to him by Western Boat in the early 1950's. Second, he produced several advertisements

for Western Boat's Fair Liner Division that had been reprinted from boating and yachting magazines and distributed to potential customers. Assuming, for the purpose of argument, that Benjamin received these advertisements *in Louisiana,* a fact that was not established, we nevertheless think that they are of little jurisdictional moment. Benjamin's third example of Western Boat's Louisiana advertising likewise has little jurisdictional effect. Both before and after the construction of the vessel, Western Boat advertised regularly in national boating and yachting magazines that were circulated in Louisiana. And after Benjamin's yacht had been completed, several feature stories in these magazines described the vessel as having its home port in New Orleans and identified Western Boat as its manufacturer. This Court stated in Buckley v. New York Times Co., *supra,* that "[t]he law is well settled that the mere circulation of a periodical through the mails to subscribers and independent distributors constitutes neither doing business nor engaging in a business activity." 338 F.2d at 474. Similarly, absent other sales activities in the forum state, merely advertising in magazines of national circulation that are read in the forum state is not a significant contact for jurisdictional purposes. We intimate no opinion on the situation where, unlike the present case, the nonresident seller or manufacturer conducts an advertising campaign aimed at the citizens of the forum state by advertising in local media.

Lastly, Benjamin contends that Western Boat, by arranging for a Louisiana firm to inspect the vessel in 1969, purposefully invoked the protections of Louisiana's law. Again, in the context of this case, we cannot agree. The firm employed was not acting for Western Boat in an agency or employee capacity.

Rather, it functioned as an independent contractor. At no time did Western Boat send representatives, inspectors, a repair or service personnel to Louisiana.

█ In sum, applying the rule as developed in Hanson v. Denckla, *supra,* we must conclude that Western Boat's activity, if any, in Louisiana never achieved the sufficiency necessary to satisfy the "minimum contacts" requirement of constitutional due process. The party seeking to invoke the jurisdiction of a court has the burden of establishing jurisdiction, *see* McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 80 L.Ed. 1135 (1936); Tetco Metal Products, Inc. v. Langham, 387 F.2d 721 (5th Cir. 1968); Gaitor v. Peninsular & Occidental S.S. Co., 287 F.2d 252 (5th Cir. 1961), and Benjamin has failed to meet that burden. The telephone and letter communications, the contract itself, Western Boat's knowledge that the vessel would be enrolled in New Orleans, the so-called advertising, and Western Boat's use of a local Louisiana firm to inspect the vessel: neither singly nor in combination do they indicate that Western Boat ever purposefully availed itself of the benefits and protections of the law of Louisiana. Maintenance of this action against Western Boat in Louisiana would unquestionably "offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. State of Washington, *supra.*

### McALEER

█ The District Court correctly dismissed, for lack of *in personam* jurisdiction, Western Boat's third party suit against McAleer. McAleer's contacts with Louisiana were even less than Western Boat's, and they similarly fall far short of the level required by constitutional due process.

Affirmed in part and reversed in part.