R. CLINTON CONSTRUCTION COMPANY, Plaintiff,

v.

BRYANT & REAVES, INC., Defendant and Third-Party Plaintiff,

v.

Porter PURYEAR, d/b/a Puryear Auto Company, Third-Party Defendant and Fourth-Party Plaintiff,

v.

Luther KELLY, Fourth-Party Defendant.

No. WC 76–100–K.

United States District Court, N. D. Mississippi, W. D.

Dec. 22, 1977.

L. G. Fant, Jr., Holly Springs, Miss., for plaintiff.

William R. Bradley, Clarksdale, Miss., for Bryant & Reaves.

William C. Murphree, Tupelo, Miss., for Puryear.

No attorney for Kelly.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this diversity action, R. Clinton Construction Company (Clinton), plaintiff, a Missouri citizen, sues Bryant & Reaves, Inc. (Bryant & Reaves), defendant, a Mississippi citizen, for damages arising out of the sale to plaintiff of allegedly defective antifreeze sold and delivered to it at Holly Springs, Mississippi. By its answer, defendant denied liability, asserting that the antifreeze which it sold plaintiff was ordered from Puryear Auto Company (Puryear), a reputable auto accessory and supply firm located at Memphis, Tennessee; that Puryear, having been requested by defendant to ship and deliver antifreeze of a good and merchantable type, caused the material to be transported directly from Memphis to Holly Springs, where it was picked up by plaintiff's agents; and that defendant, at no time, either inspected the containers or examined or tested the antifreeze material prior to acceptance by plaintiff. Defendant also asserted that it relied upon Puryear as a responsible merchant to furnish antifreeze of a merchantable quality, which was an article commonly sold for general use and which defendant purchased in the usual course of trade; that defendant relied upon Puryear, as seller, to furnish a good and merchantable product, and defendant was without negligence on its part regarding the sale of antifreeze to plaintiff.

Defendant filed a third-party action against Porter Puryear, d/b/a Puryear Auto Company at Memphis, charging that if it were liable to plaintiff for the sale of defective goods, Puryear, as third-party defendant, was negligent in selecting the antifreeze which defendant requested it to supply by procuring the product from a manufacturer without first ascertaining that Luther Kelly, d/b/a Kelly Chemical Company, produced reliable and merchantable antifreeze; and that as a result of Puryear's actions, any damages awarded against defendant should be cast upon Puryear because of his negligence and breach of implied warranty. Puryear, the third-party defendant, then filed a fourth-party complaint against Luther Kelly (Kelly), formerly a citizen of the State of Tennessee and now of the State of North Carolina, alleging that Kelly manufactured the antifreeze which Puryear supplied to Bryant & Reaves; that Kelly, as manufacturer of the product, recommended its use as an effective antifreeze in vehicles and breached his legal duty as the manufacturer of the product to Puryear, including breach of implied warranty to the customer, Bryant & Reaves; and therefore if Puryear were held for loss sustained by plaintiff, Kelly, as fourth-party defendant and manufacturer of the allegedly defective antifreeze, should be made liable to Puryear, as fourth-party plaintiff, for the loss cast upon him. Process upon Kelly was had under Mississippi's

long-arm statute, Miss.Code Ann. § 13–3–57 (1972), by service upon the Secretary of the State of Mississippi; and Kelly, having failed to timely answer or otherwise respond, Puryear, by duly filed affidavit, has requested the clerk to enter default against Kelly as the fourth-party defendant.

Service of process upon Puryear was attempted under the state's long-arm statute through service upon the Secretary of State. Because of subsequent events, we detail the following developments of Puryear's actions in this case. On January 17, 1977, the Secretary of State notified the court that its process, although it had been properly addressed to Puryear's Memphis, Tennessee, place of business, had been returned unclaimed. On July 15, Puryear filed its answer to the third-party complaint, setting out as one of its defenses the lack of in personam jurisdiction under the long-arm statute, but omitting any challenge to the sufficiency of process or sufficiency of service of process. On October 7, after obtaining leave of court, Puryear filed its fourth-party complaint against Luther Kelly, a citizen of North Carolina, the manufacturer of the antifreeze. On December 12, only two days prior to trial, Puryear, by separate motion, moved to dismiss the third-party complaint for lack of in personam jurisdiction under the long-arm statute and raising *for the first time* insufficiency of service of process. Since the motion to dismiss was not filed prior to the pretrial conference before the United States Magistrate, and, in fact, not brought to the court's attention until the eve of trial, the court, with the agreement of the parties, carried Puryear's motion to dismiss with the evidentiary hearing on the merits.

On December 14, 1977, upon the call of the case, Clinton, Bryant & Reaves, and Puryear appeared in court personally and by their counsel, and announced their readiness for trial. After the introduction of oral and documentary evidence, and the court having received arguments of counsel, the case is now ripe for decision. From the evidence adduced, the court, in observance of Rule 52(a), F.R.Civ.P., incorporates herein its findings of fact and conclusions of law.

## I.

### (a) *Facts relating to Transactions Between Clinton and Bryant & Reaves.*

The essential facts in this case are largely undisputed. On and long prior to October 21, 1975, Clinton was engaged in performing substantial highway construction jobs, and moving large quantities of earth for highway grading, in the vicinity of Marshall County, Mississippi. For that purpose, it owned and operated heavy earth-moving equipment and vehicles powered by internal combustion engines. On or about October 21, plaintiff, through its job superintendent, Terry Sargent, took the customary, necessary steps to "winterize" the heavy earth-moving equipment and vehicles by preparing them for nonuse during the winter season of 1975–76. According to his established practice, Sargent and his agents, knowing that the vehicles would remain immobile from late November or early December until early March, sought to procure antifreeze for the vehicles to protect them against damage from engine freezing. Clinton did not handle or distribute antifreeze or equivalent products, but only performed work as a highway construction contractor. To obtain the antifreeze, Sargent contacted Mike Reaves, part-owner and vice president of the defendant, a firm which operated an auto supply business at Holly Springs. Sargent told Reaves of the need to protect Clinton's heavy equipment and machinery from freezing during the months it would be immobile and out of use. Sargent placed an order with defendant for 300 gallons of antifreeze, specifying that the product should be of a good, permanent quality, but mentioning no brand name. Sargent, however, did request that the material, if at all possible, be delivered in 55 gallon drums to a point at Holly Springs, for pickup at plaintiff's convenience.

Since defendant did not have in stock any brand of antifreeze material, Reaves telephoned one of its regular wholesale suppliers, American Dixie & Supply Company, at

Memphis, and inquired of Jack Childers, a salesman for American Dixie, whether his firm could supply 300 gallons of antifreeze. Childers advised Reaves that his company had no antifreeze in stock but suggested that he, Reaves, call Puryear, who was also engaged in the automotive supply business at Memphis, as a possible source of antifreeze. Reaves readily acknowledged at trial that Sargent had requested that, while no brand name was specified, plaintiff wished to purchase a good, first-class permanent type of antifreeze for use in its heavy equipment, power-driven machines and other vehicles during the shutdown winter season of 1975–76.

Acting upon Childers' suggestion, Reaves contacted Puryear inquiring whether he could supply antifreeze material. Puryear advised that he could obtain antifreeze material, the precise brand name of which was not specifically mentioned, from a local manufacturer; that the material, however, could not be supplied in 55 gallon drums as requested by plaintiff, but in one gallon jugs. Reaves notified Sargent that antifreeze material could be delivered only in this form, but that defendant would undertake to have the material, upon its arrival by motor carrier at Holly Springs, stored at the Rebel Motor Freight Line terminal, at no cost to plaintiff, and that the material could be picked up as needed by plaintiff during the late fall months of 1975. Upon Sargent's agreeing to this, defendant requested Puryear to ship the material. Puryear then contacted Kelly, who was doing business as Kelly Chemical Company, at Memphis, and manufacturing an antifreeze material known as Kelly's Freezone, labeled as an antifreeze and summer coolant. Kelly advised Puryear that he, Kelly, would personally arrange for shipment of the large quantity ordered by defendant, and pay Puryear a commission for arranging the sale. Accordingly, Kelly, as Puryear's agent, caused the material to be shipped, in one-gallon jugs, by common carrier truck line to Holly Springs, where it was stored and picked up periodically by plaintiff's agents.

At the commencement of the work season, in March 1976, plaintiff's agents undertook to start up various pieces of its heavy equipment, nine of which are involved in this litigation. It found that upon attempting to start the engines, defects such as broken water lines and bursted heads were observed. Sargent, the job superintendent, then caused the equipment to be thoroughly checked, and he observed unusual corrosion in and about the radiator, water lines and other interior portions of the motors visible to the eye. Sargent reported this abnormal condition to his superior, sending along a jug of Kelly's antifreeze material. This material was forwarded to St. Louis Testing Laboratory, which made a chemical analysis of the material and reported that it contained 1.24% chloride, a salt-water solution capable of producing corrosion of a damaging nature if injected into water systems of internal combustion engines.

W. D. Trowbridge, chemical analyst for the St. Louis testing firm, testified that a solution of chloride, to any extent, should not be present in antifreeze material, which should have a base of ethylene glycol; and that of his general knowledge, antifreeze materials, such as Prestone and other nationally known brands, are manufactured without the presence of chloride, or other chemical having a salt-water component. In this expert's opinion, chloride would inevitably produce corrosion of a damaging nature if introduced into water systems of internal combustion engines. Trowbridge, after examining typical parts of plaintiff's damaged equipment, was of the firm opinion that the extensive corrosion found on the inner parts of the motors and equipment was caused by the salt-water solution, or chloride material, which he found to be present in Kelly's Freezone antifreeze. The engines of plaintiff's vehicles, in due course, were broken down, flushed out and necessary parts and labor supplied to restore them to operating condition. The evidence showed without dispute that the plaintiff suffered the following losses: $1,096.20 as the purchase price for the defective antifreeze, which it paid to defendant, $30,-884.66 expended as the reasonable cost of

labor and parts to correct plaintiff's equipment damaged by the corrosion produced by the defective Freezone, and $9,893.50 loss sustained by plaintiff because of downtime of its machines during the period of repair. The damages which plaintiff suffered amount to $41,874.36.

### (b) Facts Underlying Dealings Between Bryant & Reaves, Puryear and Kelly.

Puryear was a resident of Memphis, where, since the spring of 1975, he had engaged in the operation of an automotive supply business. He had previously been a local used car dealer. In October 1975, he received a telephone call from Bryant & Reaves which was placed from Holly Springs. Puryear took the call at his Memphis office and agreed to deliver the Kelly's Freezone antifreeze as requested by Bryant & Reaves. Puryear owned several trucks but delivered his products only within a two-mile radius, within the State of Tennessee. At no time did he send his trucks across state lines into the State of Mississippi. He had no prior dealings with Bryant & Reaves, or, so far as the evidence shows, with other Mississippi customers. After arranging the delivery of the antifreeze material, Puryear deposited in his Memphis bank a check drawn by Bryant & Reaves on a Mississippi bank in payment of the antifreeze.

Puryear first met Kelly during the summer of 1975 when Kelly came to Puryear's used car lot seeking an automobile part. Kelly later brought Puryear several gallons of antifreeze material which he stated he was manufacturing and which he asked Puryear to try out. Puryear accepted a supply of Kelly's antifreeze which he put into his freezer to test out, and ascertained that the material did not freeze but remained a liquid. During 1974 Puryear decided to use Kelly's Freezone antifreeze in his inventory of used cars. Before doing so, however, he investigated the material by obtaining a report from the Barrow-Agee Laboratory at Memphis, which disclosed that the material had adequate freezing resistance and was without corrosive content. Also, Pu-

ryear visited Kelly's place of business, where he saw that the product was being manufactured in a quonset hut, in the rear of Kelly's house where Kelly maintained an office, doing business as Kelly's Chemical Company. Puryear noticed that Kelly's operation consisted of two employees who operated a motor-driven mixer which drained the liquid into plastic containers on which labels were affixed, stating that it was Kelly's Freezone antifreeze or summer coolant.

Puryear then decided to stock a quantity of Kelly's antifreeze material in his automotive supply business, and he sold it across the counter to his customers throughout the fall and winter months of 1975–76. Puryear conceded that Kelly's price was considerably lower than nationally advertised brands of antifreeze. According to Puryear, he had no trouble or complaints of any kind with the product when he used it in his inventory of used automobiles in 1974. He stated that his first knowledge of any difficulty was when Bryant & Reaves reported that Clinton had experienced corrosion from the use of the material in its heavy equipment which has remained immobile and unused from December 1975 to the end of March 1976. Upon learning of this complaint, Puryear ceased to deal in the product and terminated all dealings with Kelly.

Puryear's uncontradicted testimony is that in determining the merchantability of the antifreeze prior to any sales, he performed a hydrometer test which showed the freezing point to be slightly lower than that of Prestone, and he placed the material in his deep freezer where it remained for two or three weeks at a temperature of 20° below zero, retaining its liquid form. Prior to Clinton's complaint, Puryear had no knowledge whatever of any defect in the antifreeze material or its propensity to produce corrosion in cooling systems. Moreover, Kelly had a reputation in the Memphis area as a reliable person who was engaged in manufacturing antifreeze material for local distribution.

## II.

### (a) *Liability to Clinton.*

As between Clinton and Bryant & Reaves, plaintiff urges that Mississippi's Uniform Commercial Code (UCC) provides three alternative grounds for recovery. For the reasons stated, and in view of the facts heretofore found, we hold there is sufficient ground to fasten liability on Bryant & Reaves for the losses suffered by Clinton directly resulting from the lack of suitability, or defective nature, of the goods sold by defendant for use as an effective, permanent-type antifreeze. The parties do not question that Mississippi's substantive law should apply. They, however, sharply disagree on the question of which principles of Mississippi's substantive law are controlling on the facts of this case. We hold that the guide to liability is to be found in pertinent provisions of the Uniform Commercial Code (UCC), as contended by plaintiff, and not, as urged by defendant, upon principles of strict liability in tort under Restatement (Second) of Torts, § 402A (1965), or the pre-UCC Mississippi common law of sales.

Section 75–2–313 of Miss.Code Ann. (1972) provides in relevant part

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

■ The evidence of the sales transaction between Clinton and Bryant & Reaves shows without dispute that the seller, in response to a specific request by the buyer, agreed to furnish a good, first-class permanent type of antifreeze for use in Clinton's heavy equipment. This agreement created,

albeit without technical words of art,[1] an express warranty under § 75–2–313 that the antifreeze would conform to the general specifications regarding type and quality stated by plaintiff in its initial request.

The antifreeze which defendant provided was defective in that it contained a chloride solution, rendering it unfit for use as a winterizing agent in internal combustion engines. Therefore, it is inescapably clear that Bryant & Reaves breached its express warranty to provide a good, first-class permanent type of antifreeze, giving rise to liability to the buyer.

■ Alternatively, the established facts cause us to conclude that the defendant breached the implied warranty of fitness for a particular purpose which arose from the course of dealing between the parties pursuant to § 75–2–315.[2]

■ Settled Mississippi jurisprudence is that to recover for breach of an implied warranty of fitness for a particular purpose, a plaintiff must show by a preponderance of the evidence that

(1) the seller at the time of the contracting had reason to know the particular purpose for which the goods were required; (2) . . . reliance by the plaintiff as buyer upon the skill or judgment of the seller to select suitable goods, and (3) [that] the goods were unfit for the particular purpose.

*Garner v. S & S Livestock Dealers, Inc.,* 248 So.2d 783, 785 (Miss.1971).

It is uncontested that the defendant seller was aware of the particular purpose to which the antifreeze requested by plaintiff would be put. Clinton, as plaintiff-buyer, after designating the quality of antifreeze desired, left selection of the particular goods to the defendant-seller, in reliance on

---

1. It is not necessary to the creation of an express warranty that the seller use formal words such as "warranty" or "guarantee" or that he have a specific intention to make a warranty. . . . Miss.Code Ann. § 73–2–313(2).

2. Where the seller at the time of contracting has reason to know any particular purpose for

which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under section 75–2–317, an implied warranty that the goods shall be fit for such purpose.

the latter's skill and judgment—facts of which the defendant was well aware, and concerning which defendant interposed neither disclaimer nor exclusionary limitation. Here, defendant proceeded to select a supplier of antifreeze to fill Clinton's order therefor, and the material provided by defendant's selection, adulterated by 1.24% chloride solution, was unfit for the particular purpose of which defendant was aware at the time the sales agreement was made.

Thus, under the applicable legal standard, defendant, having made no attempt to exclude or modify the effect of § 75–2–315, breached the implied warranty of fitness for a particular purpose created by the statute.

■ Yet another alternative, independent basis for liability may be found in defendant's breach of the implied warranty of merchantability created by § 75–2–314, which provides in relevant part:

(1) A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

(2) Goods to be merchantable must be at least such as . . .

(c) are fit for ordinary purposes for which such goods are used . . ..

It would be untenable to contend either that Bryant & Reaves, a firm customarily dealing in such goods, i. e., antifreeze (see § 75–2–104(1)), was not obligated by an implied warranty of merchantability arising from its agreement with plaintiff, or that such warranty was not breached when the antifreeze defendant provided caused extensive damage to plaintiff's machinery. See *Garner,* supra, at 785. Indeed, it is undisputable from the evidence that this particular shipment of Kelly's Freezone, containing a chloride solution, was entirely unfit for the ordinary purpose for which such materials are normally used.

■ The measure of damages allowable to a plaintiff-buyer which proximately result from breach of warranty is set forth in § 75–2–714(2) and (3). In the case sub

judice, such damages include the recovery of the purchase price of the goods since the antifreeze material was without value as delivered, § 75–2–714(2), and consequential damages, as contemplated by § 75–2–715(2)(a), consisting of the reasonable cost of the labor and parts necessary to repair the damaged machinery and of loss of income to Clinton during the down-time occasioned by the period of repairs. These items of expense Bryant & Reaves had, at time of contracting, reason to know would probably result from a breach of warranty for the damages could not have been reasonably prevented by cover of the machinery or other practicable means for avoiding loss. We therefore hold that plaintiff is entitled to recover from defendants total damages of $41,874.36.[3]

■ Defendant vigorously urges that since it was a retailer which neither inspected nor saw the antifreeze material prior to its delivery to plaintiff, and the Kelly's Freezone antifreeze was sold at retail by defendant to Clinton, its customer, in the regular course of trade, in exactly the same condition as it came from the manufacturer, Bryant & Reaves owed no duty to inspect or discover latent defects, such as the chloride present in the shipment, and that it should therefore be exonerated of liability. Defendant's reliance upon *Sam Shainberg Company of Jackson v. Barlow,* 258 So.2d 242 (Miss.1972), *Early-Gary, Inc. v. Walters,* 294 So.2d 181 (Miss.1974), and *Parker v. Ford Motor Co.,* 331 So.2d 923 (Miss.1976), is entirely misplaced. In each of these cases, plaintiffs brought product liability suits against defendant retailers based upon strict liability in tort within the parameters of § 402A of American Law Institute's Restatement of Torts (Second). They were not actions against retailers based upon express or implied warranties arising out of sales transactions subsequent to the adoption of Mississippi's UCC. It is, of course, quite clear that the Supreme Court of Mississippi has not extended to a retailer, nor would we extend, in the usual case,

**3.** Plaintiff waives demand for prejudgment interest.

responsibility based upon § 402A strict tort liability, a doctrine that ordinarily applies only where the seller of the product is a manufacturer, or one who assumes the role or status of the manufacturer. Section 402A liability has no application whatever in the present case. Counsel for defendant next urge that, in any event, *Rizzo v. Jordan Wholesale Co.,* 214 So.2d 604 (Miss. 1968), negates the creation of an implied warranty of fitness or quality of articles in a sale made by one who is not a manufacturer. *Rizzo* at 606. *Rizzo* is clearly distinguishable since the law governing that decision predates the effective date of Mississippi's Uniform Commercial Code, which occurred March 31, 1968. True enough, in *Rizzo,* plaintiff unsuccessfully sued a retailer upon implied warranty from a 1965 sale of cotton seed assertedly defective because of its lack of germination capability,[4] and Justice Patterson, in *Rizzo,* discussed and applied principles of common law sales which prevailed before the adoption by Mississippi of the UCC. *Rizzo* can be read in no other way; otherwise it is irreconcilable with *Garner,* a 1971 decision authored by Chief Justice (then Presiding Justice) Gillespie, which specifically discussed the warranty provisions of the UCC. It can only be concluded that the UCC has robbed *Rizzo* of continuing vitality.

The argument that retailers should not be held responsible as guarantors for the great variety of products which they sell in the ordinary course of trade has, of necessity, yielded to countervailing policy considerations inherent in the UCC. This change of law is clearly stated by the Third Circuit in *Vlases v. Montgomery Ward & Co.,* 377 F.2d 846, 850 (1967), which construed the UCC of Pennsylvania, incidentally the first State in the Union to adopt the UCC (effective date July 1, 1954). Circuit Judge McLaughlin in *Vlases,* in rejecting the retailer's contention that it should not be responsible for latent or unascertainable defects, stated:

The entire purpose behind the implied warranty sections of the Code is to hold the seller responsible when inferior goods are passed along to the unsuspecting buyer. What the Code requires is not evidence that the defects should or could have been uncovered by the seller but only that the goods upon delivery were not of a merchantable quality or fit for their particular purpose. If those requisite proofs are established the only exculpatory relief afforded by the Code is a showing that the implied warranties were modified or excluded by specific language under Section 2–316. Lack of skill or foresight on the part of the seller in discovering the product's flaw was never meant to bar liability. The gravamen here is not so much with what precautions were taken by the seller but rather with the quality of the goods contracted for by the buyer.

See Anderson, Vol. I, UCC, 2d Ed., §§ 2–313, 2–314 and 2–315, pages 476, et seq.

(b) *Liability of Bryant & Reaves vis-a-vis Puryear and Kelly.*

We next discuss the status of the defendant's third-party complaint against Puryear and Puryear's fourth-party complaint against Kelly, the antifreeze manufacturer.

The threshold question is whether the court has jurisdiction under the third-party complaint filed by defendant against Puryear. As heretofore noted, defendant sought to obtain process upon Puryear by serving the Mississippi Secretary of State under the long-arm statute, and it did not otherwise seek or obtain service upon Puryear.[5] It is worthy of noting that defend-

---

4. Inquiry of the Clerk of Circuit Court of Bolivar County discloses that the trial court's judgment was rendered December 19, 1966.

5. The court mistakenly stated in its informal bench ruling that Puryear had also been personally served by the United States Marshal for the Western District of Tennessee. As Puryear's counsel correctly point out, no such service was attempted or ever had, and the only service sought upon Puryear was under the long-arm statute, and this was aborted or not accomplished because of advice to the court from the secretary of state's office that the summons forwarded in registered mail envelope, restricted delivery to Puryear, at his Memphis, Tennessee business address was returned with the notation of "unclaimed" on the envelope.

ant omitted serving Puryear personally on its third-party claim filed under Rule 14, F.R.Civ.P., in accordance with Rule 4(f), at Puryear's place of residence in Memphis, Tennessee, which was within the 100-mile exception allowed by 4(f) for extraterritorial personal service of a third-party defendant. In a post-trial motion, Puryear has urged that because of this omission, and the court's determination that Puryear was not subject to in personam jurisdiction under the long-arm statute, Puryear should therefore be dismissed. While adhering to the opinion on the facts found that Puryear was not subject to in personam jurisdiction by "long-arm" service, we nevertheless reject Puryear's contention that he is not personally subject to this court's jurisdiction. Several reasons exist to establish that Puryear is subject to in personam jurisdiction. Because of the unique situation presented as well as the important principles of law involved, we will set forth in some detail the basis for our keeping Puryear in the case as a third-party.

■ In the first place, Rule 12(b)[6] expressly provides that every defense, in law or in fact, to a claim for relief in any pleading shall be asserted either in the answer or other responsive pleading, or, at the pleader's option, by separate motion. Seven specific grounds are set forth in Rule 12(b) which may be so optionally asserted

by the pleader. These grounds are quite specific as to subject matter. The grounds here pertinent, and which are required to be affirmatively asserted, relate to "(4) insufficiency of process, or (5) insufficiency of service of process." The failure of a pleader to raise by answer or motion constitutes a waiver, by Rule 12(h)(1),[7] of defenses based upon lack of jurisdiction over the person (here pleaded), improper venue (here not material), and *insufficiency of service of process or insufficiency of process.* We are of the view that under the above portions of Rule 12, F.R.Civ.P., Puryear clearly waived the defenses of insufficiency of service of process and insufficiency of process by omitting to present them either in his answer to the third-party complaint or in lieu thereof, by separate motion *specifically asserting* said grounds of defense prior to the filing of his responsive pleading.[8]

■ Apart from technical waiver under Rule 12(h)(1), the evidence is replete with affirmative and deliberate acts of waiver by Puryear as a litigant in this court. Puryear preserved the defense of lack of in personam jurisdiction by setting up in his answer that specific objection as a ground for dismissal. Had he done no more than await judicial resolution of the challenge to in personam jurisdiction only by "long-arm" service, conceivably he might have been dismissed because the attempted service of

6. Rule 12(b), F.R.Civ.P.:

Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted.

7. Rule 12(h)(1) provides:

A defense of lack of jurisdiction over the person, improper venue, insufficiency of proc-

ess, or insufficiency of service of process is waived . . . (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

8. *Stavang v. American Potash and Chemical Corporation,* 344 F.2d 117, 118–119 (5th Cir. 1965), (12(b)(6) motion to dismiss asserting as sole ground failure to state claim upon which relief could be granted was waiver of challenges to personal jurisdiction), *Ryan v. Glenn,* 52 F.R.D. 185, 189 (N.D.Miss.1971), (12(b)(6) motion asserting sole ground of failure to state a claim upon which relief could be granted and omitting challenge to service of process held waiver of latter defense) footnote 7, at 190, and cases cited therein.

process by that means was ineffectual. Puryear, however, chose not to pursue that course; instead, he adopted a radically different procedure. First, he elected to file a fourth-party complaint against Kelly, as fourth-party defendant, expressly invoking this court's jurisdiction. By this affirmative step Puryear

"became a plaintiff in [his] turn, invoked the jurisdiction of the court in the same action, and, by invoking, submitted to it . . . This single fact shows that the [third-party] defendant, if he elects to sue upon his claim in an action against him, assumes the position of an actor and must take the consequences." *Merchants Heat & Light Co. v. James B. Clow & Sons,* 204 U.S. 286, 289–90, 27 S.Ct. 285, 286, 51 L.Ed. 488 (1907).

"One who comes into court seeking relief . . . and actively presses his claim thereby invokes the court's jurisdiction in the case so that he cannot thereafter question the authority of the court to pass upon all questions raised between himself and his adversary." *Kincade v. Jeffery-De Witt Insulator Corp.,* 242 F.2d 328 at 332 (5 Cir. 1957).

Next, not merely invoking our jurisdiction by suing Kelly, Puryear moved for default judgment against Kelly, after he was effectively served under the state's long-arm statute and failed to answer timely. He made no attempt to withdraw the fourth-party claim at any time. Puryear may not extricate himself from having voluntarily submitted to the in personam jurisdiction of this district court by relying upon an "eleventh-hour" motion to dismiss which raises *for the first time* the insufficiency of service of process upon him and by proceeding to trial on the merits without seeking to dismiss his fourth-party complaint against Kelly and withdrawing all affirmative steps to effect recovery as a plaintiff in this court. The court cannot countenance the post-trial effort by Puryear, after a judicial decision was announced from the bench on the law and facts favorable to Puryear as to the inadequacy of service under the long-arm statute, but adverse to him because of his residence within, and having adequate substantial business contacts within the so-called "bulge" exception, although outside the state of Mississippi, yet within the 100-mile radius from the place of trial at Oxford.[9]

Though not necessary to our decision on jurisdiction over the person, we agree with Puryear that, on the facts of this case, he did not have "sufficient minimum contacts" with Mississippi under *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), or "purposeful activity" under *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), to subject him to in personam jurisdiction in this state. Though Puryear did receive in Memphis a single telephone call placed at Holly Springs, Mississippi, by a Mississippi customer, pursuant to which he caused goods to be shipped into Mississippi, f. o. b. Memphis, Tennessee, by

9. Of course, had Puryear, who admittedly lived and did business within the "bulge" area of 100 miles from Oxford, the place of trial, been personally served at his Memphis residence by the United States Marshal for the Western District of Tennessee, such personal service would have unquestionably established in personam jurisdiction of this forum.

". . . Rule 4(d)(7) was amended in 1963 to overcome whatever doubts had previously existed as to the ability of federal courts to utilize [forms of extraterritorial service of process authorized by the laws of the several states]. . . . The Notes of the Advisory Committee . . . show that the purpose of the amendment was not simply to provide a second way of serving persons already subject to the state long-arm statutes, but rather to allow complicated controversies to be ended by a single lawsuit if all the necessary third parties could be found within 100 miles of the courthouse. See 2 Moore, Federal Practice ¶ 4.42[2] (2d ed. 1967)."

*Coleman v. American Export Isbrandtsen Lines, Inc.,* 405 F.2d 250 at 252 (2 Cir. 1968); *Sevits v. McKiernan-Terry Corp.* (New Jersey), 270 F.Supp. 887 (S.D.N.Y.1967); *Pillsbury Co. v. Delta Boat & Barge Rental, Inc.,* 72 F.R.D. 630 (E.D.La.1976) (due process measured by "minimum contacts" with the state of service under Rule 4(f), F.R.Civ.P.); *see Mississippi Pub. Corp. v. Murphree,* 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185 (1946) (Congress has power to authorize nationwide service of process for federal courts).

common carrier, he had no other contacts of any kind with Mississippi. He did not solicit business or send agents into the state, he owned no property there, and, prior to Reaves' call, had done no business whatever within the forum state. The isolated act of receiving a telephone call and supplying goods from a point outside Mississippi, does not rise to such quality or substance as to satisfy fundamental notions of fair play and substantial justice required by due process. There is simply not enough shown toward the making of a single contract, though partially performed in Mississippi, to justify application of the state's long-arm statute. Indeed, the only act performed by Puryear occurred in Tennessee and falls far short of purposeful commercial entry into the forum state. *Miller v. Glendale Equipment & Supply, Inc.*, 344 So.2d 736 (Miss.1977), relied upon by defendant, is clearly distinguishable, since the out-of-state seller in *Miller* used his own agent and truck to deliver goods from Canton, Ohio, to the customer in Attala County, Mississippi. Although *Miller* involved a single "telephone contract", the point of origin not being disclosed by the court's opinion, the dispositive fact was that "Glendale [the defendant] delivered the machine through its agent [on one of Glendale's trucks] to Miller in Mississippi using the roadways of this state. Certainly, the contract was performed in part by Glendale and Miller in the State of Mississippi." at 739. The case sub judice is more akin to the Fifth Circuit's holding in *Benjamin v. Western Boat Building Corp.*, 472 F.2d 723 (1973), construing Louisiana's long-arm statute. Applying the constitutional standard of *International Shoe* and *Hanson,* the defendant, a boat builder in Tacoma, Washington, was held not subject to long-arm service. The Fifth Circuit concluded

> Not even under the broadest interpretation of the due process minimum contacts

requirement can Western Boat be found to have purposefully enjoyed the benefits and protections of Louisiana law.

*Benjamin* at 729. The essential facts in *Benjamin* were that the defendant negotiated by mail and then accepted a contract, at Tacoma, to build a sailboat for the Louisiana plaintiff for an agreed price of more than $162,000, all but $35,000 of which was paid by checks drawn on a Louisiana bank; the boat was constructed and delivered to plaintiff at Tacoma, and plaintiff returned the boat to New Orleans, Louisiana, where he had it duly enrolled as a home-ported vessel. Most assuredly, Puryear's contact with Mississippi was no greater than that of Western Boat with Louisiana. Lastly, on the facts found, we hold that Puryear committed no tort upon Bryant & Reaves, thus that category of activity under Mississippi's long-arm statute, Miss.Code Ann. § 13–3–37 (1972),[10] need not be addressed.

We are then brought to the merits of the third-party complaint against Puryear. Two grounds of liability are asserted: (1) that Puryear negligently selected Kelly as the supplier of the goods and by failing to exercise reasonable care required of a merchant dealing in antifreeze material, Puryear breached the duty of ordinary care owing to his customer, Bryant & Reaves, by furnishing defective goods, and therefore should be held liable for all losses proximately caused by his alleged negligence; and (2) that should UCC apply, Bryant & Reaves are entitled to invoke against Puryear breach of the implied warranty of merchantability because of the defective condition of Kelly's Freezone antifreeze.

 On the evidence adduced, we find that the third-party plaintiff wholly failed to establish negligence on the part of Puryear or that Puryear was otherwise guilty of tortious conduct in procuring antifreeze material from Kelly. The facts heretofore found clearly exonerate Puryear of

---

**10.** There are three distinct, separate categories of activity which may render a nonresident subject to service under the statute: (1) "make a contract with a resident of this state to be performed in whole or in part . . . in this state," or (2) commission of "a tort in whole or in part in this state against a resident of this state," or (3) doing "any business or perform any character of work or service in this state." *C. H. Leavell & Co. v. Doster,* 211 So.2d 813, 814 (Miss.1968).

any negligence or lack of ordinary care in procuring antifreeze material from Kelly, for, on the basis of his previous tests and experience, the antifreeze material, generally, was an effective product which had caused no bad consequences or any degree of corrosion. That the particular shipment of Kelly's antifreeze material delivered to Bryant & Reaves for Clinton's use proved to be defective does not make out a case of negligence. The rule is well settled that in order to fasten liability upon a party for negligence, it must be shown by a preponderance of the evidence that he either knew or through the exercise of reasonable care should have known that his selection of a particular material would cause damage to his customer.

Nevertheless, we do hold that Bryant & Reaves, as the third-party plaintiff, is entitled to recover against Puryear for breach of the implied warranty of merchantability. This is so whether the choice of law should be that of Tennessee or of Mississippi. In either case the result is the same. Tennessee's Uniform Commercial Code, TCA, Section 47–2–314, creates an implied warranty of merchantability in a sale made by a person who is a merchant respecting goods of that kind, that the goods, in order to be merchantable, must be at least such as are fit for the ordinary purposes for which the goods are used. In *Ford Motor Co. v. Taylor,* 60 Tenn.App. 271, 446 S.W.2d 521 (1969), liability was imposed against the retail dealer, Passions Ford Tractor Company, for breach of the statutory warranty of merchantability, while at the same time Ford Motor Company, the automobile manufacturer, was held liable for tortious misrepresentation. It is, of course, readily apparent that Tennessee's UCC section creating the implied warranty of merchantability is identical to that of Mississippi's, Miss.Code Ann. § 75–2–314. In our view, the same result would be reached under *Garner's* rationale.

We, therefore, hold that Puryear is liable to Bryant & Reaves for the very same damages and losses for which Bryant & Reaves are liable to Clinton.

This leaves only the fourth-party complaint of Puryear against Kelly to be considered. It is manifestly clear that Kelly manufactured and sold the antifreeze material, that the material was defective and unreasonably dangerous for use when it left Kelly's hands, that Kelly, as manufacturer, expected the material to reach the user or customer, which it did, without substantial change, in the same condition in which it was sold by Kelly. Thus, all of the elements required by Section 402A imposing strict liability in tort appear in this case and clearly fasten liability upon Kelly to Puryear. *State Stove Manufacturing Co., et al. v. Hodges,* 189 So.2d 113 (Miss.1966); *Hamilton Fixture Co., Inc. v. Anderson,* 285 So.2d 744 (Miss.1973); and *Pridgett v. Jackson Iron & Metal Co.,* 253 So.2d 837 (Miss. 1971).

There is, of course, no jurisdictional problem regarding Kelly against whom default has been entered. Kelly, as the manufacturer of the antifreeze material, caused it to be placed in the stream of interstate commerce, knowing that it would cross state lines in the usual course of business, and in this particular instance, he directly placed it into the stream of commerce by causing its delivery into Mississippi. Under *Smith v. Temco, Inc.,* 252 So.2d 212 (Miss. 1971), as well as the Fifth Circuit case of *Dawkins v. White Products Corp. of Middleville, Michigan,* 443 F.2d 589 (5 Cir. 1971), Kelly is clearly subject to personal jurisdiction in this court. Therefore, he is subject not only to judgment for failing to answer, but is adjudicated on the merits to be liable to Puryear as the manufacturer of a defective product within the standards of firmly established Mississippi jurisprudence.

Let an order issue accordingly.