132 So.2d 573 (1961)
CROWLEY GRAIN DRIER, INC., Plaintiff-Appellant,
v.
Zeal FONTENOT et al., Defendants-Appellees.
No. 331.
Court of Appeal of Louisiana, Third Circuit.
July 12, 1961.
Rehearing Denied September 7, 1961.
Joseph S. Gueno, Jr., Crowley, for plaintiff-appellant.
McGee & Soileau, by Donald Soileau, Mamou, for defendant-appellee.
Before TATE, HOOD, and CULPEPPER, JJ.
TATE, Judge.
The plaintiff filed suit for the balance alleged to be due for some seed rice. The defendants reconvened, seeking principally damages alleged to have been sustained because of the inferior quality of some other seed rice purchased from the plaintiff company. The trial court dismissed the plaintiff's demand and also rendered judgment in reconvention in favor of the defendants-appellees for a $24.75 excess paid to the plaintiff-appellant for the rice purchased; but the reconventional claim for damages was dismissed.
The plaintiff appeals from the dismissal of its suit. The defendants answer the appeal, praying chiefly for recovery of the damages sought by their reconventional demand.

*574 I.
On May 3, 1958 at its plant in Crowley the plaintiff company delivered 240 hundred-pound bags of Blue Bonnet seed rice to Zeal and Hadley Fontenot, rice farmers.[1] At a price of $8.25 per hundredweight, the gross retail selling price of this seed rice was $1,980.00. The plaintiff seeks recovery of this sum, less certain credits, for a net demand of $1,097.25. Essentially, the defense pleaded, and accepted by the trial court as proved, is that the 240 bags of rice delivered on May 3, 1958 were intended to be furnished without cost in exchange for some seed rice which had been previously bought and paid for, but which had proved to be of inferior quality, as a result of which the farmer-buyers were forced to replow their fields which had been planted with it and to replant them with the new rice furnished on May 3rd.
The defendant Zeal Fontenot testified flatly that he had received the additional 240 bags of rice from the plaintiff's warehouseman-assistant manager upon the specific agreement that it was to replace the earlier seed rice bought, if the latter was proved to have been defective. Under questioning by the trial court, the plaintiff's employee in question frankly admitted that he had told this defendant, at the time he returned the 58 bags with the complaint that the earlier plantings from this lot of seed had not produced a satisfactory stand, that the seed was guaranteed and that the defendants could have other seed in exchange both for the planted and unplanted portion of it, providing tests by the laboratories proved there was "something wrong" with it. (Tr. 240-241.)
The plaintiff nevertheless contends that there was no agreement to exchange the 240 bags of seed rice delivered to the defendants on May 3rd for the seed rice earlier purchased by them which had failed to produce a good stand of early rice (as a result of which the defendants admittedly replowed their fields and replanted a new rice crop with the seed received on May 3rd, which new planting without contradiction produced a good stand of rice and ultimately a good crop). The plaintiff's position thus is that the plaintiff must pay for the 240 bags of rice furnished him on May 3, 1958, since there was no agreement to give credit for other than the 58 bags of unplanted seed rice returned that same day. (The plaintiff further contends that the admittedly poor stand produced from the earlier planting of seed rice was due to the weather and other poor planting conditions for which the plaintiff-seller cannot be held responsible.)
It will be best to view these contentions in the context of the factual background shown by this record.
The uncontradicted evidence shows the following: On February 13, 1958 the defendant-farmers "booked" (that is, purchased for subsequent delivery) 243 hundred-weights from Lot 825 of Blue Bonnet seed rice at $8.25 per hundred-weight. They had previously inspected the germination record of this and other lots of rice and had then specified that the seed to be furnished to them from Lot 825. On April 2nd the defendants received 97 hundredweight bags of seed rice from this lot and immediately planted it. On April 24th they received another 97 bags, paying at that time the full sum of $2,004.75 due for the entire 243 bags that on February 13th they had contracted to purchase. On May 3rd the defendant Zeal Fontenot returned 58 bags of the seed rice from Lot 825 previously purchased, alleging that it was not germinating and producing a proper stand of rice; on that day, he received 240 hundredweights of Blue Bonnet seed rice from another lot which sold at the same price.
The plaintiff's manager and its assistant manager both admitted that they had guaranteed *575 an 85% germination of the seed rice from Lot 825 sold. Actually, after the seed from Lot 825 was returned, three out of the four tests made of the seed rice of this lot showed a considerably lower germination: the tests of the returned rice by the Louisiana and Mississippi Department of Agriculture laboratories made for both plaintiff and the defendants showed, respectively, 76.5, 75.5, and 71% germination; as compared with a 93% germination in a test made for the plaintiff by a private laboratory in Texas.
The defendant Zeal Fontenot testified that he specified Lot 825 because the plaintiff's records showed that this lot had a germination rate of 93%, based upon which implied warranty he purchased specifically from this lot. (Unfortunately the plaintiff had lost its germination recordwhich it is admitted must ordinarily be maintained for several years, but the plaintiff's warehouseman admitted that the test of this lot made by the plaintiff on its own premises, the results of which were showed to prospective purchasers, did show a high germination rating and that the defendants specified their purchase to be from Lot 825 because of it, Tr. 221, 227.) However, both the manager and the assistant manager of the plaintiff corporation testified that they only "guaranteed" an 85% germination, despite any higher showing in the test.
Even though the average testing of the seed rice of Lot 825 returned to the plaintiff company showed only 79% germination, or well below the 85% germination which the plaintiff admitted guaranteeing to the farmers at the time of the sale, the plaintiff's manager stated that such lower germination was not a default in the warranty made at the time of sale because under State regulations there was a 7% "tolerance" allowed. We do not find such contention to be especially impressive, since this witness frankly admitted that the farmer customers were not informed that the germination guaranteed to them was subject to such a tolerance (Tr. 314, 315); the manager as a matter of fact admitted that even the assistant manager-warehouseman, charged with the duty of dealing with customers in the sale of seed rice for the plaintiff, was "not aware of * * * what these tolerances are" and had not been informed of them (Tr. 300).
We think that the defendants have proved by the great preponderance of the evidence that the seed rice of Lot 825 furnished to them in April actually was of inferior quality. Not only did most of the laboratory germination tests show that it was below the "guaranteed" germination, but the testimony of the defendants and several neighboring farmers show that, despite adequate preparation and care, the seed from this lot produced a very inferior stand, irregular and spotty, with a large portion of the seed infected by a fungus growth. Seed rice from other lots planted at the same time in the neighboring fields produced satisfactory stands of rice. In addition, one neighboring farmer who had planted seed rice from Lot 825, but who did not for financial reasons replow and re-plant, produced a crop of two-thirds or less of the per-acre yield of the crop produced from seed rice of other lots.
The expert witnesses produced by the plaintiff who viewed the defendants' rice fields at the time admitted that a very inferior stand had been produced by the seed from Lot 825. Based upon a number of hypothetical suggestions, as well as their own observations, these experts concluded that the poor stand was not due to the poor germination rate of the seed but rather to the weather, the temperature, fungus in the soil, etc. However, for the most part these experts also did not deny that, if the conditions of the same weather and the same planting care had been observed in the defendants' fields as in the neighboring fields planted at the same time, and a good stand resulted in the latter but not in the defendants' fields, then that some defective quality of the seed may have contributed, such as the fungus infection found in one of the tested samples of Lot 825.
*576 The experts further testified that it was lawful to sell seed with germination rates as low as 60%, that the seed from Lot 825 could have produced an adequate stand of rice even though with a germination rate below the 85% admittedly guaranteed, and that even with a 71-79% germination the defendants should have received an adequate stand had the planting care and weather conditions been proper. Of course, as the defendants suggest, even though such seed rice might have produced an "adequate" stand, it was not of the quality they had contracted for; the evidence actually shows that in a neighboring field seed from Lot 825 produced a yield of only 12 barrels per acre, as compared with the normal 18-20 barrels per acre produced from other seed lots planted in the area.
We have reviewed the facts at this length because it is in the context of them that we must determine which of the completely contradictory versions of the seed delivery of May 3rd, upon which this suit is based, that of the defendant Zeal Fontenot on the one hand, and of the plaintiff's manager on the otherrepresents the more accurate recollection of the incident to which, with no doubt equal sincerity, both of these gentlemen testified.
We find no error in the trial court's determination that the seed rice obtained on May 3, 1958 was intended to replace the defective lot earlier furnished to the defendant-farmers by the plaintiff. The plaintiff admitted that it had "guaranteed" a germination of at least 85% in the seed from Lot 825 earlier sold, and its employee who sold the seed admitted that the defendants had purchased with particular reference to the lot's purportedly high germination rate. This employee's recollection of the incident when another 240 bags of seed rice was delivered to the defendant Zeal Fontenot on May 3rd is to some extent corroborative of the latter's testimony that he was not to pay for it if tests proved that this seed did not measure up to the seller's guarantee. Likewise somewhat corroborative of this defendant's testimony is the circumstance that the plaintiff did not make out a sales ticket for the new lot of rice at the time it was delivered on May 3, nor did the plaintiff mail such a charge slip to the defendants until July; such sales tickets being usually furnished when rice was sold, but never when rice was merely exchanged.
The trial court therefore properly rejected the plaintiff's demand to recover for the 240 bags of rice at $8.25 per bag furnished on May 3, 1958, less credits for previous overpayments and for the 58 sacks of rice returned that day. Likewise, since the defendants had previously paid for a total of 243 bags of seed rice but had only received 240 bags by the delivery of May 3rd, the trial court properly in accordance with defendants' reconventional demand rendered judgment in their favor for $24.75, the overpayment for three bags of rice.

II.
By answer to the appeal, the defendants principally urge that the trial court was in error in rejecting their reconventional demand for damages sustained by them because of the defective first lot of seed planted by them, such as the expense of plowing up and replanting the fields in which the defective seed had been planted. The defendants' claim is founded upon LSA-Civil Code Article 2545 which provides: "The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, is answerable to the buyer in damages."
The trial court's dismissal of the reconventional demand was based upon its sustaining the plaintiff's plea of one year prescription under LSA-Civil Code Articles 2534[2] and 2546[3].
*577 The defective seed was purchased and paid for on or before April 24, 1958, and its defective nature was discovered by May 3rd of that year. This suit was filed on August 21, 1959, while the reconventional demand seeking recovery of such damages was not filed until October 5, 1959, thus being more than one year after discovery of the defective nature of the seed.
Ordinarily, as the defendants contend, the prescription applicable for damages caused by a breach of contract is not a one year prescription, but is rather the ten year prescription provided by LSA-Civil Code Article 3544.[4] See American Heating & Plumbing Co. v. West End Country Club, 171 La. 482, 131 So. 466; Vicknair v. Rapides Parish School Board, La.App. 3 Cir., 128 So.2d 821. However, unlike damages for other contractual breaches, damages caused by a breach of the warranty in a contract of sale are regarded as founded upon redhibition and subject instead to the cited codal prescription of one year applicable to redhibitory actions. Rapides Grocery Co. v. Clopton, 171 La. 632, 131 So. 734; Walton v. Katz & Besthoff, Inc., La.App. Orl., 77 So.2d 563, certiorari denied.
The Rapides Grocery case, above-cited, has facts very similar to the present. The seller brought suit to recover the unpaid balance due for certain cottonseed sold. The defendant buyer reconvened for the damages and loss of profit caused him through some defective soy bean seed sold to him by the seller in another transaction. The Supreme Court held that the buyer's reconventional demand, filed more than one year after the defective nature of the soy bean seed had been discovered, was barred by the redhibitory prescription of one year.
The above-cited Walton opinion contains a clear and succinct discussion of the question and of the relatively few decisions concerning it. The court concluded that a claim by the buyer against the seller for damages by reason of redhibitory defects is regarded by the jurisprudence as founded upon redhibition and is barred by the prescriptive period of one year from the date of sale (see Article 2534) if the seller did not know of the defect, or one year from the date of discovery of the defect by the buyer (Civil Code Article 2546) if the seller actually knew of the defect. The historical reason for application of this shorter prescription period for claims for damages arising out of breaches of sales contracts, as compared with that applicable to damages for breaches of other types of contracts, is the practical necessity to determine promptly and certainly whether the article sold did or did not have the vices claimed. See George v. Shreveport Cotton Oil Co., 114 La. 498, 38 So. 432.
The trial court correctly dismissed the defendant's reconventional demand as barred by the one year prescription applicable to redhibitory actions.
For the foregoing reasons, at the cost of the plaintiff-appellant, the trial court judgment is
Affirmed.

On Application for Rehearing.
En Banc.
PER CURIAM.
The plaintiff-appellant has filed an application for rehearing.
In our original opinion we affirmed the trial court judgment "at the cost of the plaintiff-appellant". The trial court had exercised its discretion and assessed the defendants with certain court costs (LSA C.C.P. art 1920), and it is suggested that our opinion is unclear as to whether we affirmed *578 the trial court judgment in all respects, or whether instead we amended it so as to assess the appellant not only with the costs of the appeal but also with all the costs of the trial court. By our decree, we affirmed the trial court judgment in all respects, including its assessment of the court costs; but assessed the appellants with the cost of this appeal.
All other contentions have been considered by our original opinion. With the above clarification, our original decree is reinstated, and the application for rehearing is denied.
Application for rehearing denied.
FRUGE, recused.
NOTES
[1] Both of these farmers have died since the time of the sale, and their estates are made parties to this suit. Mr. Zeal Fontenot was alive at the time of the trial, however, and his testimony is in the record. The purchasers will in this opinion be referred to as the defendant farmers.
[2] Art. 2534. "The redhibitory action must be instituted within a year, at the farthest, commencing from the date of the sale. * * *"
[3] Article 2546. "In this case [when the seller fails to declare a vice known to him], the action for redhibition may be commenced at any time, provided a year has not elapsed since the discovery of the vice. * * *"
[4] LSA-Civil Code Article 3544: "In general, all personal actions, except those before ennumerated, are prescribed by ten years." (Italics ours.)