Jack AUSTIN, d/b/a Jack Austin & Associates, Plaintiff-Appellant Cross-Appellee,

v.

NORTH AMERICAN FOREST PRODUCTS, et al., Defendants-Appellees, Cross-Appellants,

and

GLASSOW SALES CO., Defendant-Appellee, Cross-Appellant and Cross-Appellee,

v.

LIFETIME DOORS, INC., Defendant-Appellee, Cross-Appellee and Cross-Appellant.

No. 80–3602.

United States Court of Appeals, Fifth Circuit.
Unit A

Sept. 21, 1981.

---

Emmett C. Sole, Lake Charles, La., for Austin.

James R. Nieset, Lake Charles, La., for North American, Glassow and U.S. Fire Ins. Co.

Michael T. Pulaski, Alexandria, La., for Lifetime.

Before REAVLEY, RANDALL and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This is a Louisiana diversity case involving the sale by North American Forest Products and Glassow Sales Company (hereinafter referred to collectively as Glassow) of door units manufactured and supplied by Lifetime Doors, Inc. to the contractor, Jack Austin (doing business as Jack Austin & Associates). In this suit, Jack Austin seeks to recover damages, penalties, and attorney's fees from the seller (Glassow), the seller's surety (United States Fire Insurance Company), and/or the manufacturer

(Lifetime). Glassow seeks to recover from Austin the balance of the purchase price of the doors and, if held liable to Austin or if denied recovery on its counterclaim against Austin, seeks indemnity from Lifetime. The district court held that the doors were defective; that Austin's action against Glassow, United States Fire Insurance Company, and Lifetime had prescribed; that Austin was not liable for the balance of the purchase price of the doors; and that Lifetime was liable to Glassow for indemnification for the unpaid balance on the purchase price of the doors and for attorney's fees. We affirm.

Austin contracted with the Corps of Engineers in early 1972 for the construction of a 260-unit family housing project at Fort Polk, Louisiana. Subsequently, Austin reached an agreement with North American Forest Products, Inc., for the supply of all of the millwork necessary to construct the 260 units, including the exterior doors at issue in this suit. On June 2, 1972, Austin issued a contract for the millwork to Glassow (a joint venture consisting of North American Forest Products, Inc., and Glassow Sales Company [1]). Item No. 3 of that contract required Glassow to furnish "[a]ll exterior doors as required to be supplied in pre-hung units with butts furnished and machined for lockset." The reverse side of the contract contained the following provisions:

The Seller is familiar with the Contractor's Quality Control System required by United States Government Contracts, and certifies that all materials supplied or furnished under this purchase order, to be used on Government Contracts, conform to the applicable specifications and/or drawings, and that any penalties levied against the Contractor, because of improper submittals of material, or materials not conforming to the applicable specifications and/or drawings, will be for the account of the Seller.

The seller warrants that the equipment, materials and/or supplies purchased hereunder are designed, manufactured and/or constructed so as to comply with all federal, state and local safety rules and regulations including, but not limited to, the Occupational Safety and Health Act of 1970.

The seller agrees to indemnify and hold buyer harmless for, of and from any loss, including but not limited to any fines, penalties and corrective measures, buyer may sustain by reason of seller's failure to comply with said laws, rules and regulations in connection with the design, manufacture and/or construction of such equipment, materials and/or supplies purchased hereunder.

The defendant United States Fire Insurance Company [2] became surety for Glassow for performance of its contract.

On August 17, 1972, Austin received from Lifetime Doors, Inc.,[3] the manufacturer of the doors, a certification—dated August 14—that the doors it proposed to furnish for use on the Fort Polk project would "be manufactured in accordance with CS [Commercial Standard] 171 Type I." Austin submitted the certification to the Corps and, in September 1972, the Corps approved the submittal upon the condition that Lifetime "furnish guarantees in compliance with Paragraph 8B–3.5 of the contract specs" [4] and "assure factory sealing is done in com-

1. North American Forest Products, Inc. and Glassow Sales Company are Oregon corporations with their principal offices in Oregon. Though neither has qualified or been formally authorized to do business in Louisiana, both have conducted business in Louisiana.

2. United States Fire Insurance Company is a corporation organized under the laws of the State of New York with its principal place of business in a state other than Louisiana. It is duly licensed and authorized to do business in Louisiana.

3. Lifetime Doors, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Michigan.

4. Paragraph 8B–3.5 provides:

*Guarantee*: All doors shall be guaranteed by the manufacturer against defects as set forth in the Standard Door Guarantee of the National Woodwork Manufacturers Association, for a period of one year after beneficial occupancy of the unit in which installed.

pliance with Paragraph 8B–3.3 of the contract specs." Paragraph 8B–3.3 provides that "[b]efore shipment of doors, top and bottom edges shall be sealed with spar varnish conforming to Federal Specification TT–V–121, or other approved water-resistant sealer." Austin advised Glassow of the Corps' conditional approval.

On August 4, 1972, Glassow issued Purchase Orders 1076 and 1077 to Lifetime for 916 1¾ inch solid core Lauan doors conforming to CS 171, Type I (fully waterproof). Glassow did not require that the doors be sealed at the factory by Lifetime. During the week of October 21, 1972, Lifetime shipped the doors that it had manufactured in Hearne, Texas, to Seminole Wood Products[5] in Mobile, Alabama. Austin received the first shipment of doors at Fort Polk on December 13, 1972.[6]

Austin completed work at Fort Polk and left there in April 1974. On September 11, 1974, Austin was informed by the Corps that the exterior doors on the Fort Polk housing units were delaminating. This triggered a flurry of correspondence between Austin, Glassow, Lifetime, and the Corps. Austin notified Glassow—by telephone and by letter—of the delamination of the doors the same day that the Corps informed Austin of the problem. Alfred J. Glassow, Jr., President of Glassow Sales Company, notified Ed Cervi of North American Forest Products, Inc. and Wayne Lees, General Sales Manager for Lifetime, of the problem that had arisen with respect to the doors. Lees, in turn, informed Donald Huber, Vice President of Lifetime, of the delamination of the doors and, beginning with a September 26, 1974 letter, Huber wrote Glassow a number of letters in which he

contended that the delamination was caused by an "architectural deficiency" in the housing units and that Lifetime was not responsible for the problem. Between September 1974 and May 1975, the Corps made repeated demands upon Austin to take some action with respect to the doors; Austin, in turn, continually demanded that Glassow take action on the problem; Glassow regularly attempted to involve Lifetime in the situation; and Lifetime steadfastly denied all responsibility.

Several letters are particularly pertinent to the claims made by the parties in this case. On September 30, 1974, Alfred Glassow wrote Austin a letter stating:

> [Donald Huber's] unwillingness to send an inspector or take any other action is to me very unrealistic. It would seem under the circumstances that they aren't about to admit that they could have made a mistake. Accordingly, we shall and will take whatever action is necessary and request the aid of both of you and the Corps of Engineers.

Thereafter, in November 1974, Glassow contacted the Pittsburgh Testing Laboratory to request the testing of several doors from the Fort Polk project. The doors were received by the Laboratory in February 1975, and the Laboratory's March 24, 1975 report concluded that "all the tested samples failed to meet the specification requirement [for Type I doors] due to excessive delamination."

A March 31, 1975 letter from Alfred Glassow to Donald Huber of Lifetime stated:

> We presume that you now have your copy of the report from the Pittsburgh Testing Laboratory which should explain

---

5. Seminole Wood Products is a corporation owned by Mr. Ed Cervi, a principal stockholder in North American Forest Products, Inc.

6. The district court found that "whether [Glassow] actually sent Austin the same doors it purchased and received from Lifetime, is unknown." Record, vol. II, at 464. This particular finding of fact is clearly erroneous. The evidence shows that Gilbert Hampton, an attorney and an examining expert on behalf of the bonding company, examined the doors at Fort Polk and found the Lifetime logo on the edge of

most of the doors he examined. He testified at trial that, of the doors he was able to examine, "[o]n all of the doors that had not been cut, we found stamped on the top of them Lifetime Doors, with some other information." Record, vol. IV, at 108–09. Since the district court did not appear to rely on this finding in reaching the remainder of his findings of fact or conclusions of law, the outcome of the case remains unaffected by this single erroneous finding of fact.

your companies [*sic*] involvement. Our present train of thought runs along the line that we are not planning to be particularly vindictive in this matter as long as we can be compensated for our costs involved in trying to get this mess resolved as quickly as possible. We are hopeful that we shall have your cooperation in this endeavor. If you have some comments and ideas as to how we should proceed, we would be pleased to hear from you.

On April 21, 1975, Alfred Glassow wrote Austin a letter that stated:

It would appear that at the present time, this situation has become pretty complicated with no one willing to assume any responsibility for the problem at hand, and with Glassow Sales Co. caught right in the middle. The writer cannot understand how Glassow Sales Co. can be held responsible for a problem over which they have absolutely no control. Consequently, we are turning this entire file over to our attorney for his consideration and advice. As soon as he has had a chance to evaluate things, we will let you know what our next move will be.

On June 2, 1975, Alfred Glassow wrote Donald Huber a letter stating:

The main purpose of this letter is to notify you that we are going to hold Lifetime Doors, Inc. responsible for all costs involved in the resolution of this problem and will also ask for reasonable damages due to negligence on the part of Lifetime Doors, Inc. by their refusal to discuss, inspect damage, or express any concern in the gravity of the situation.

In June 1975, Glassow requested that the Laboratory test four additional doors. A June 13, 1975 letter from Alfred Glassow to Austin stated in part:

As you will note, we have asked the Corps for enough time to have the new tests completed and are hopeful such will be the case. When the time comes, we will be happy to cooperate and assist in any way we can. At the present time, the problem of replacement seems to be yours although we realize it will eventually revert to us and then finally to Lifetime Doors, Inc. In the meantime, we feel we have done all that we can at the present time. We still believe that we are not at fault in any way, as we clearly bought exterior doors conforming to CS 171–58; the manufacturer invoiced us as exterior doors Type 1; and you have the notarized letter of August 14, 1972 from John W. Tucker certifying that the doors they proposed to furnish would be manufactured in accordance with CS 171–58 Type 1.

The Laboratory's September 10, 1975 report reached the same conclusion that its earlier report had reached—that the doors did not pass the test provided by Commercial Standard 171 for Type I doors. Finally, between April 29 and August 10, 1976, Austin replaced the exterior doors.

On May 3, 1976, Austin filed suit against Glassow, U.S. Fire, and Lifetime,[7] seeking damages for the defective doors. In his original complaint, Austin estimated that the cost of replacing the doors would be $100,000. By way of a second supplemental and amended complaint, Austin prayed for the sum of $44,565.33—the actual cost of installing and painting new doors—legal interest thereon, together with attorney's fees and penalties provided for by Louisiana

---

**7.** On June 8, 1976, Lifetime filed a motion to dismiss the complaint and to quash the summons on the grounds that (1) the United States District Court for the Western District of Louisiana did not have personal jurisdiction over Lifetime and (2) the complaint did not state a claim upon which relief could be granted because the cause of action had prescribed. The district court denied the motion on November 10, 1976. On July 25, 1977, Lifetime filed a motion for rehearing. This motion was granted and, in August 1977, the district court first converted Lifetime's motion to dismiss Austin's claim against Lifetime into a motion for summary judgment, and then the court granted the motion on the ground that Austin's claim against Lifetime had prescribed. Lifetime remained a party to this lawsuit as a defendant to Glassow's cross-claim and, subsequently, as a defendant to a third-party claim filed against it by Austin on December 22, 1978, praying for indemnity from Lifetime in the event that Glassow recovered from Austin on Glassow's counterclaim against Austin.

law. Glassow filed a counterclaim against Austin for the unpaid balance on the purchase price of the doors. In addition, Glassow filed a cross-claim against Lifetime seeking indemnity and attorney's fees. Lifetime filed a cross-claim against Glassow seeking indemnity for any damages that might be assessed against Lifetime.

After the trial,[8] the district court held that, under Louisiana law, Austin's suit was an action in redhibition. Such an action must be brought within one year of the date of the discovery of the defect. The district court held that Austin's suit, which was filed "more than a year after the defects appeared, more than one year after the dispute concerning the cause of failure had arisen, more than one year after Glassow had advised Austin that he was referring the matter to his attorney, and more than one year after the buildings had been accepted," had prescribed. Record, vol. II, at 467. In addition, the district court held that Austin had failed to prove that Glassow had made any representations that would interrupt the prescriptive period. The district court further found that the doors were defective and, as a result, Glassow could not recover against Austin on its counterclaim for the balance of the purchase price of the doors—$15,301.64—since

the redhibitory defects provided Austin with a valid defense against such a claim. Finally, the district court held that Glassow was entitled to indemnification from Lifetime for the loss Glassow had suffered as a result of the redhibitory defects—the balance of the purchase price and attorney's fees expended by Glassow in defending against Austin's redhibition suit.

A review of the pertinent dates reveals the following:

| | |
|---|---|
| Austin Contracted with Glassow | June 2, 1972 |
| Lifetime Shipped the Doors | October 21, 1972 |
| Austin Received the Doors | December 13, 1972 |
| Austin Completed Work at Fort Polk | April 1974 |
| Austin Was Notified of Delamination of Doors and Austin Notified Glassow of Delamination | September 11, 1974 |
| First Demand by Corps That Austin Replace the Doors | November 19, 1974 |
| Final Demand by Corps That Austin Replace the Doors | May 16, 1975 |
| Austin Paid for Replacement of the Doors | April 29 – August 10, 1976 |
| Austin Filed Suit | May 3, 1976 |

8. Prior to trial, Austin filed a motion to vacate and/or reconsider the summary judgment granted in favor of Lifetime. Also prior to trial, Glassow and U.S. Fire filed a motion for summary judgment. On April 5, 1978, the district court made the following ruling:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the motion to vacate the summary judgment granted in favor of Lifetime Doors, Inc. be denied and that summary judgment be granted in favor of defendant Lifetime Doors, Inc. and against plaintiff, Jack Austin, an individual, d/b/a Jack [Austin and Associates,]

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Glassow Sales Company and U.S. Fire Insurance Company, rejecting the demands of Jack Austin, an individual, d/b/a Jack Austin and Associates, against them, and

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the cross-complaints of Lifetime Doors, Inc. and Glassow Sales Company and U.S. Fire Insurance Company

against each other be, and they are hereby, dismissed, and

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the reconventional demand of Glassow Sales Company against Jack Austin, and [sic] individual, d/b/a Jack Austin and Associates, be maintained as an action on the docket of this Court.

Record, vol. I, at 288–89.

Although Austin attempted to appeal this decision to the Fifth Circuit, his motion to withdraw the appeal and to remand to the Western District of Louisiana (made pursuant to a joint stipulation of the parties) was granted by the Court of Appeals since the district court, in its judgment, had not made an express determination that there was no just reason for delay in the entry of judgment on less than all of the claims. Consequently, there was no appealable order. On March 20, 1979, the district court rescinded and recalled its April 5, 1978 judgment. The motions of Glassow and U.S. Fire for summary judgment were referred to the merits.

The district court was correct in characterizing Austin's suit as one in redhibition, despite Austin's repeated contentions that his suit was one for breach of warranty.[9] Under Civil Code article 2529, when a seller represents goods to have a certain quality, the failure of the product to have that quality gives rise to an action in redhibition if that quality was the principal motive for making the purchase. Redhibition is "the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." La.Civ.Code art. 2520. Damages caused by a breach of warranty in a contract of sale are regarded, under Louisiana law, as founded upon redhibition.[10] *Cotton States Chemical Co. v. Larrison Enterprises, Inc.*, 342 So.2d 1212, 1214–15 (La.App.2d Cir. 1977); *Crowley Grain Drier, Inc. v. Fontenot*, 132 So.2d 573 (La.App. 3d Cir. 1961). Thus, while a suit for breach of contract is generally subject to a ten-year prescriptive period, an exception exists in redhibition actions involving defective merchandise. The general prescriptive period applicable to breach of contract actions does not apply to these cases.[11]

Austin further maintains that his action was not one in redhibition because he was not in the position of the classic plaintiff-buyer who brings a redhibition action.

This argument has two parts. First, Austin claims that he was not the ultimate consumer or the owner of the doors. He only purchased the doors pursuant to his construction contract with the Corps of Engineers, and it was the Corps that was the ultimate buyer. This argument has been rejected by at least one Louisiana court. In *Christy-Ann-Lea, Inc. v. Charter Homes of Louisiana, Inc.*, 327 So.2d 569, 570 (La.App. 4th Cir.), *writ denied*, 332 So.2d 277 (La. 1976), the court stated:

> Plaintiff also makes the argument that the redhibition articles of the Civil Code dealing with implied warranty against defects should only apply in the consumer-seller situation. Since, plaintiff claims, this is not such a situation (that is plaintiff did not intend to be the ultimate consumer) they should not apply in this case. Plaintiff cites no authority for this position and we fail to see the reasoning behind it. We feel the redhibition articles were meant to apply to almost all sales no matter who the ultimate consumer be. They certainly apply here.

Similarly, the redhibition articles apply in the instant case. Second, Austin argues that since he was not the ultimate consumer or owner of the doors, he was not in a position to tender the doors to Glasgow or to Lifetime for rescission purposes. He contends that "a buyer who wishes to rescind the sale must be in a position to return the purchased item." *Morris N. Palmer Ranch*

---

**9.** Austin also argued that his action was not a suit in redhibition because it was based upon Glasgow's express, contractual obligation to indemnify Austin. This argument—that Austin's action is one for indemnification as expressly allowed by the contract—is without merit. The contract explicitly provides for indemnification only for losses caused by the failure of the seller to comply with federal, state, and local safety rules and regulations in connection with the design, manufacture, and/or construction of the equipment, materials, and/or supplies purchased pursuant to the contract. Although the doors did not comply with the contract specifications, no party has contended that they violated any federal, state, or local safety rules or regulations.

**10.** "[T]o be a redhibitory action the underlying transaction must be a sale." *Gulf States Utils.*

*Co. v. Ecodyne Corp.*, 635 F.2d 517, 520 (5th Cir. 1981). The district court properly characterized the transaction between Austin and Glasgow as a sale rather than a building contract.

**11.** This is not to suggest, of course, that misrepresentations by the seller as to the quality of the thing sold cannot, under appropriate circumstances, rise to the level of fraud and serve as the basis of an action that is not subject to the one year prescriptive period for redhibition. La.Civ.Code art. 2547; *Layne v. Schroeder*, 399 So.2d 1262, 1264–65 (La.App. 4th Cir. 1981); *Cotton States Chem. Co. v. Larrison Enterprises, Inc.*, 342 So.2d 1212, 1214 (La.App. 2d Cir. 1977). We do not, however, have such a case before us here.

*Co. v. Campesi,* 647 F.2d 608, 612 (5th Cir. 1981). According to Austin, it follows that his suit was not one in redhibition since he was only an intermediate seller without title to the doors and therefore was unable to tender the doors to Glassow—a necessary prerequisite to rescission of the sale. Despite Austin's assertions on appeal, it appears that Austin *was* in a position to tender the doors. The evidence reveals that after Austin replaced the exterior doors pursuant to the demands of the Corps, Austin discarded some of the doors and stored some of the doors in Leesville, Louisiana. Austin did have control over the disposition of the doors and consequently was in a position to tender the doors.

■ Civil Code article 2534 provides that an action in redhibition must be brought within one year of the date of the sale. That article further provides that "[t]his limitation does not apply where the seller had knowledge of the vice and neglected to declare it to the purchaser." There is a conclusive presumption that a manufacturer knows of the defect in his product. *Philippe v. Browning Arms Co.,* 395 So.2d 310, 318 n.15 (La.1981) (on rehearing); *Alexander v. Burroughs Corp.,* 359 So.2d 607, 609 (La.1978); *Associates Financial Services Co. v. Ryan,* 382 So.2d 215, 220 (La.App. 3d Cir. 1980); *Franklin v. American Motors Corp.,* 344 So.2d 1130, 1132–33 (La.App. 3d Cir. 1977); *Breaux v. Winnebago Industries, Inc.,* 282 So.2d 763, 770 (La.App. 1st Cir. 1973). In the situation where the seller had knowledge of the vice, the one-year prescriptive period commences at the date of the discovery of the defect by the buyer.[12] La.Civ.Code art. 2546. *Cotton States Chemical Co.,* 342 So.2d at 1214–15; *Horil v. Napko Paint Co.,* 270 So.2d 261, 263 (La. App. 4th Cir. 1972). The suit by Austin against Glassow, a seller that was unaware of the defect, was filed more than one year after the sale. Thus, this suit by Austin

against Glassow and its surety have prescribed. The suit by Austin against Lifetime, a seller with knowledge of the defect, was filed more than one year after the discovery of the defect and so has also prescribed.

■ The district court's conclusion that the doors were defective is supported by substantial evidence. The prescriptive period of one year will not bar redhibitory defects from being asserted as a defense against a suit for the sale price of the object. *J.B. Beaird Co. v. Burris Brothers,* 216 La. 655, 44 So.2d 693, 697 (1949); *Continental-Emsco Co. v. D & D Drilling Co.,* 201 So.2d 873, 875 n.2 (La.App. 3d Cir. 1967). *See* La.Code Civ.Pro.Ann. art. 424. Thus, while Austin's redhibitory action against all parties has prescribed and was properly dismissed by the district court, Austin has a valid defense against Glassow's remaining counterclaim for the amount due on the purchase price of the doors. Consequently, the district court properly ruled that Austin was not liable to Glassow for the remainder of the purchase price. Indeed, Glassow does not even contest this ruling on appeal.

There remains then only Glassow's claim for indemnity and attorney's fees against Lifetime. Civil Code article 2531, as amended in 1974, provides in part that:

> In any case in which the seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding and similar right of action against the manufacturer of the thing for any losses sustained by the seller, and further provided that any provision of any franchise or manufacturer-seller contract or agreement attempting to limit, diminish or prevent such recoupment by the seller shall not be given any force or effect.

Thus, if Glassow, a good faith seller, were held liable to Austin because of redhibitory

---

12. Aside from the commencement of the prescriptive period, there is another significant difference between a good faith and a bad faith seller. A good faith seller—one who is unaware of the defects in the product—is liable only for restoration of the purchase price and corresponding expenses of the sale. La.Civ. Code art. 2531. On the other hand, a seller who knew of the defects is additionally liable for damages occasioned by the defects and for attorney's fees. *Id.* art. 2545.

defects in the doors, Glassow would clearly have a right of action against Lifetime for its losses pursuant to article 2531. "Furthermore, in such third party actions, recovery of attorney's fees by the seller against the manufacturer is permissible." *Riche v. Krestview Mobile Homes, Inc.*, 375 So.2d 133, 138 (La.App. 3d Cir. 1979).

It appears that this right to attorney's fees in an article 2531 action by a seller against a manufacturer arises under article 2545, which states, "The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, is answerable to the buyer in damages." This article has not been interpreted to restrict an award of attorney's fees only to the buyer who ultimately brings the redhibitory action. Rather, the Louisiana courts have interpreted this Code article to apply to an intermediate buyer like Glassow who buys the thing for resale. *Porche v. Robinson Brothers*, 349 So.2d 975, 977 (La.App. 1st Cir.), *writ denied*, 351 So.2d 171 (La.1977). The *Porche* court held that "Article 2531 does not negate or restrict any rights which may be afforded a buyer under Article 2545." *Id.* It appears then that articles 2531 and 2545 are to be read in conjunction with each other to provide the seller with a redhibitory cause of action in the nature of indemnity [13] against the manufacturer and to allow the seller in such an action to recover attorney's fees from the manufacturer. In *Cobb v. Coleman Oldsmobile, Inc.*, 393 So.2d 402 (La.App. 1st Cir. 1980), for example, the plaintiff, who had purchased an automobile from defendant Coleman Oldsmobile, Inc., sued Coleman in redhibi-

tion. The suit was filed more than one year from the date of sale, but within one year of the time Coleman abandoned its attempts to repair the automobile. The trial court rescinded the sale and awarded plaintiff costs and attorney's fees. Coleman, in turn, brought a third-party action against the manufacturer, BMW, pursuant to article 2531. The court of appeal held that, although Coleman's action was filed more than one year after the discovery of the defect, the prescriptive period for a seller's article 2531 action against the manufacturer does not begin to run until the seller is held liable for the redhibitory defects. Thus, Coleman's action against BMW was timely filed. Second, the court held that a purchaser who sues only the good faith seller and not the manufacturer is not entitled to an award of attorney's fees. A good faith seller who brings an article 2531 action against the manufacturer, however, is entitled to an award of attorney's fees under article 2545.

Applying these principles to the case at bar, Lifetime contends that Glassow has no right of action against it because Glassow was not actually held liable to Austin for any redhibitory defects in the doors. Indeed, Lifetime suggests that because Austin's redhibition claim had prescribed, article 2531 is totally inapplicable to Glassow's claim against Lifetime. The district court found, on the other hand, that although Austin's redhibition action had prescribed, Glassow had suffered a loss because of the redhibitory defects in the doors within the meaning of article 2531: because the doors were defective, Glassow was unable

13. It is not certain whether the seller's article 2531 action over against the manufacturer is properly characterized as an action in redhibition or as an action for indemnity. *See, e. g., Peterson v. Coleman Oldsmobile, Inc.*, 393 So.2d 372, 376–77 (La.App. 1st Cir. 1980) (Under article 2531, the seller is entitled to indemnity over against the manufacturer); *Daigle v. Robinson Bros.*, 368 So.2d 186, 188 (La.App. 1st Cir. 1979) (Under article 2531, a seller "has a right of action against Manufacturer, in redhibition, which right may not be abridged, restricted or diminished by agreement between such parties." In this case, since there was no

redhibitory defect at the time of the sale by the manufacturer to the seller, there was "no basis for maintaining [seller's] action in redhibition against Manufacturer."). This Court, therefore, expresses no opinion as to whether the seller's article 2531 right of action against the manufacturer is subject to the ten-year prescriptive period applicable to indemnity actions, *LeBlanc v. Big Jim's, Inc.*, 252 So.2d 181 (La.App. 3d Cir. 1971), or the one-year prescriptive period applicable to redhibitory actions. In either case, Glassow's action against Lifetime was timely filed.

to recover the balance of the purchase price from Austin. The district court concluded that this loss suffered by Glassow came within the provisions of article 2531 and, consequently, Glassow was entitled to be indemnified by Lifetime for the balance of the purchase price and the attorney's fees Glassow incurred in the defense of Austin's claim.

Although Austin's redhibition action against Glassow has prescribed, Glassow's article 2531 action against Lifetime to recover losses suffered by reason of the redhibitory vices in the doors has not prescribed. The prescriptive period contemplated by article 2531 does not begin to run until the seller has been held liable as a result of a redhibitory defect. *Cobb*, 393 So.2d at 403–04 ("[The manufacturer's] argument is that the words 'corresponding and similar right of action' [in article 2531] necessarily means an action in redhibition subject to prescription of one year that begins to run at the same time prescription begins to run against the purchasers. We do not agree. The statute speaks in terms of the seller being held liable before the 'similar right of action against the manufacturer' arises."). *See Blue Streak Enterprises, Inc. v. Gulf Coast Marine, Inc.*, 370 So.2d 633, 635 (La. App. 4th Cir. 1979) ("Prescription does not begin to run on claims for indemnification and/or contribution until the party seeking same is, itself, cast in judgment."). When the district court held that Austin was not liable to Glassow for the balance of the purchase price on the doors because of the redhibitory vices in the doors, Glassow suffered a loss as a result of the defectively manufactured doors. The prescriptive period on Glassow's corresponding action against Lifetime began to run at that time.

The district court correctly pointed out that the recent jurisprudence applying article 2531 has involved factual situations different from the one before this Court. *See, e. g., Cobb; Robertson v. Jimmy Walker Chrysler-Plymouth, Inc.*, 368 So.2d 747 (La. App. 3d Cir.), *writs denied*, 371 So.2d 833, 834 (La.1979). In each of these Louisiana cases, a buyer has prevailed in a redhibitory action against a good faith seller and the

seller has, in turn, pursued a claim against the manufacturer. Those courts have held that the seller is entitled to be indemnified by the manufacturer for the seller's share of the judgment in favor of the buyer on the redhibitory claim, as well as for attorney's fees. *Cobb*, 393 So.2d at 404; *Robertson*, 368 So.2d at 754. Here, while Austin did *not* prevail in his redhibition claim against Glassow (since that claim had prescribed), because the buyer was able to use the redhibitory defects as a defense against the seller's counterclaim, the seller did suffer a loss that was directly attributable to the redhibitory defects of the doors. We agree with the district court that this situation comes within the language of article 2531 and that Lifetime was properly held liable to Glassow for indemnification of the balance of the purchase price and the attorney's fees spent by Glassow in defending against Austin's claim.

There are three additional arguments raised on appeal that we must address: (1) whether statements made by Glassow delayed the beginning of the prescriptive period as to Austin; (2) whether Austin was entitled to relief under an equitable theory of unjust enrichment; and (3) whether the district court correctly asserted in personam jurisdiction over Lifetime.

*Commencement of Prescriptive Period*

■ Austin contends that even if the principles and prescriptive period of a redhibition action apply, the actions and representations made by Glassow, which led Austin to believe that Glassow would take action on the defective doors, delayed the beginning of the prescriptive period. The law is settled that when a seller attempts to repair a defect, or when his verbal or written communications lead the buyer to believe that the defects will be corrected, then the prescriptive period does not begin to run until the seller abandons his attempts to repair the defects. *Systems Fuels, Inc. v. Bethlehem Steel Corp.*, 645 F.2d 469 (5th Cir. 1981); *Sweeney v. Vindale Corp.*, 574 F.2d 1296, 1298 (5th Cir. 1978). Austin contends that, at least up through June 1975,

Glassow made representations that it would take care of the defective doors. As a result of these representations, Austin claims that this action, which was filed May 3, 1976, was timely filed.

■ To support Austin's contention that Glassow led Austin to believe that Glassow would correct the defects in the doors, Austin points to several letters written by Glassow: (1) The September 30, 1975 letter to Austin stating that "we shall and will take whatever action is necessary and request the aid of both of you and the Corps of Engineers"; (2) the March 31, 1975 letter to Lifetime noting that Glassow intended to seek compensation from Lifetime "for our costs involved in trying to get this mess resolved as quickly as possible"; (3) the June 2, 1975 letter to Lifetime reiterating the financial responsibility of Lifetime; and (4) the June 13, 1975 letter to Austin stating that "we realize [the problem] will eventually revert to us." Moreover, Austin testified at trial that between June 2 and June 13, 1975, Alfred Glassow told Austin— during a number of telephone calls—that Glassow had the problem "under control" and that "he was going to take care of this situation at Fort Polk." Record, vol. III, at 209. Finally, Austin points to Glassow's direct dealing with the Pittsburgh Testing Laboratory and Glassow's June 1975 request to the Corps that Glassow be given additional time in which to test four more doors as evidence that Glassow led Austin to believe that Glassow would take responsibility for the doors.

The district court was correct in holding that "[t]here was not sufficient action on Glassow's part to interrupt prescription." Record, vol. II, at 467. The district court concluded that "[a]t no time did Glassow promise that he would replace the doors; it was his position that his responsibility (as the seller) would ultimately revert to either

Austin or Lifetime." *Id.* The evidence overwhelmingly supports the district court's conclusion that Glassow never actually promised to replace the doors. Moreover, we agree with the district court that none of Glassow's statements or actions were sufficient to delay the commencement of the prescriptive period. Rather, Glassow's letters indicated that, although Glassow was willing to investigate the situation, the immediate responsibility for the doors was Austin's and the ultimate responsibility was Lifetime's. Even if, as Austin argues, Glassow's September 30, 1974 letter—stating that "we shall and will take whatever action is necessary"—could reasonably have led Austin to believe that Glassow would undertake the replacement of the doors, neither Glassow's actions nor his written communications thereafter were consistent with a belief that Glassow would replace the doors. Particularly after Glassow's April 21, 1975 letter to Austin—explicitly denying that Glassow had any liability for or control over the situation—Austin could not reasonably have believed that Glassow would replace the doors. Consequently, if Glassow's earlier letters did delay the beginning of the prescriptive period, the prescriptive period certainly began to run on April 21, 1975, when Glassow unequivocally abandoned any prior position that might have led Austin to believe that the doors would be replaced by Glassow. Thus, Austin's suit—filed May 3, 1976—was not timely filed.[14]

*Unjust Enrichment*

■ Austin argues that he is entitled to relief against the manufacturer for unjust enrichment under the law of *Minyard v. Curtis Products, Inc.*, 251 La. 624, 205 So.2d 422 (1967). That case characterized this type of action—known as an action *de in rem verso*—as follows:

---

**14.** Glassow contends that the cases involving a delay in the beginning of the prescriptive period apply only when the seller leads the buyer to believe that the seller will *repair* the defects. Glassow argues that in the case at bar, Austin sought *replacement* of the defective doors rather than *repair* of the doors. Consequently, according to Glassow, the concept of delaying the commencement of the prescriptive period is inapplicable here. We need not address this contention since, as we decided above, even if the concept does apply here, Austin's suit was not timely filed.

It derives from the principle of equity which forbids enrichment at the expense of another, and since it has been regulated by no provision of the enacted law, its exercise is subject to no precise rules; it is sufficient that the plaintiff allege and undertake to prove that as a result of some sacrifice or act on his part he has procured an advantage to the defendant. *Id.* at 432. There are five prerequisites to this action:

> (1) [T]here must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i. e., the action is subsidiary or corrective in nature.

*Id.*

Such an action was allowed in *Minyard.* In that case, the contractor Pittman subcontracted with Minyard for the application of the caulking required under the construction contract. The caulking compound used by Minyard was defective, and the owner of the building project recovered from the contractor (Pittman) the costs of recaulking. Pittman recovered judgment over from the subcontractor Minyard, and Minyard then filed suit against the successor to the manufacturer of the caulking compound. The trial court considered Minyard's claim to be one in redhibition, and found that it was barred by the one-year prescriptive period. The Louisiana Supreme Court reversed, stating that a suit by Minyard against the *seller* of the product would be subject to the defense of prescription applicable to an action in redhibition, but that the defense of prescription would not necessarily bar suit by Minyard for indemnity against the *manufacturer* with whom Minyard had no contractual relationship. *Id.* at 427. The court stated, "Minyard seeks indemnity against the manufacturer, not the seller, and since there was no buyer-seller relationship the prescription applicable to suits in redhibition or for suit on an express contract are not applicable." *Id.* Indeed, the court found that the law provided no express statutory remedy for Minyard here; consequently, Minyard had an action *de in rem verso.*

 It is well settled that the buyer now has a direct right of action against the manufacturer in redhibition.[15] *Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc.,* 315 So.2d 660, 663 (La.1975); *Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc.,* 262 La. 80, 262 So.2d 377, 381 (1972); *Reeves v. Great Atlantic & Pacific Tea Co.,* 370 So.2d 202, 206–07 (La.App. 3d Cir.), *writs denied,* 371 So.2d 835 (La.1979) & 372 So.2d 568 (La.

---

15. Apparently, prior to *Media Prod. Consultants, Inc. v. Mercedes-Benz of N. Am., Inc.,* 262 La. 80, 262 So.2d 377, 381 (1972), there was some question whether a buyer had a direct right of action in redhibition against a manufacturer with whom he had no privity. Thus, in a somewhat different context from the case at bar, and prior to the Louisiana Supreme Court's decision in *Media,* this Court stated that the Louisiana redhibition articles "contemplate a direct, seller-buyer, contractual or commercial law relationship, not a manufacturer-ultimate consumer relationship." *Lartigue v. R.J. Reynolds Tobacco Co.,* 317 F.2d 19, 29 (5th Cir. 1963). One Louisiana court, in a case involving a plaintiff who was injured as a result of a defective product, has characterized the post-*Media* development in the law as follows:

> Prior to the *Media* decision, the use of the redhibitory action to a plaintiff who was injured by a defective product was of little utility. The remedy was against the seller of the product and not the manufacturer. . . .
> This situation changed somewhat, however, beginning with the *Media* decision. That case, and its progeny, most notably *Rey v. Cuccia,* 298 So.2d 840 (La.1974), put to rest any requirement of privity as between the purchaser of the defective product and the manufacturer of that product in a suit to recover under the Codal articles on redhibition. Thus, under *Media* a buyer would be allowed to proceed directly against the manufacturer of a defective product in redhibition, thereby removing one of the factors that would have restricted a plaintiff injured by a defective product, namely, limitation of potential defendants to the immediate seller. *Reeves v. Great Atl. & Pac. Tea Co.,* 370 So.2d 202, 206 (La.App. 3d Cir.), *writs denied,* 371 So.2d 835 (1979) & 372 So.2d 568 (1979).

1979). Since Austin had a remedy at law against the manufacturer—a redhibitory action, which unfortunately, has prescribed—Austin does not satisfy the fifth requirement for an action *de in rem verso.* Under Louisiana law, when an adequate remedy at law is available, the court may not resort to principles of equity. *See* La. Civ.Code art. 21. Consequently, Austin has no action for unjust enrichment against Lifetime.

### In Personam Jurisdiction

Lifetime argues that the United States District Court for the Western District of Louisiana could not assert personal jurisdiction over Lifetime because Lifetime is a Delaware corporation with no agent, employee, or representative in Louisiana. Lifetime asserts that it is not now and has never been domiciled in Louisiana. It maintains no office, warehouse, or other place of business in Louisiana. Moreover, Lifetime alleges that it neither contracted directly with Austin, nor entered into a contract with any other defendant for the delivery of material in the State of Louisiana. Lifetime notes that (1) the purchase orders from Glassow were placed by telephone from Glassow's office in Oregon to Lifetime's office in Michigan; (2) the oral purchase orders were confirmed in writing by letters from Glassow's office in Oregon to Lifetime's office in Michigan; (3) the doors ordered by Glassow were shipped to Seminole, Alabama; and (4) Lifetime never sent a representative to Louisiana to inspect the doors installed there. Indeed, according to Lifetime, it is not now conducting and has never conducted business in the State of Louisiana.

■ The district court properly concluded that both Louisiana law and federal due process permitted the exercise of in personam jurisdiction over Lifetime. The Louisiana Long-Arm Statute provides, in pertinent part:

> A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from the nonresident's

> (a) transacting any business in this state
> . . . .

La.Rev.Stat.Ann. § 13:3201 (West 1968). This statute was intended to permit the full exercise of in personam jurisdiction allowable under due process standards in cases when the suit "arises from" the nonresident's contacts with the forum. *Standard Fittings Co. v. Sapag, S.A.,* 625 F.2d 630, 638–40 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981). "Business activity which will satisfy the requirements of due process will thus necessarily satisfy the 'transacting business' requirement of the Long-Arm Statute." *Id.* at 641.

■ The Supreme Court has long since stated that to comport with due process in subjecting a nonresident defendant to in personam jurisdiction, he must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). To determine whether the requirements of due process have been met, this Court looks to whether the defendant has purposefully availed himself of the benefits and protection of the forum state's laws, whether the forum state has any special interest in exercising jurisdiction, and whether the convenience of the parties favors litigating in another state. *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 494–98 (5th Cir. 1974). *See Standard Fittings,* 625 F.2d at 641–43.

With regard to the purposeful availment prong of this test, the *Product Promotions* Court stated that "even if the defendant performs no physical act within the State, activities outside the State can provide adequate contacts if they have reasonably foreseeable consequences within the State." In addition, the Court noted that "[t]he operative consideration is that the defendant's contacts with the forum were deliberate, rather than fortuitous, so that the possible need to invoke the benefits and protections of the forum's laws was reasonably foresee-

able, if not foreseen, rather than a surprise."[16] 495 F.2d at 496 (footnotes omitted).

■ In the instant case, Lifetime clearly knew that the doors it manufactured were to be shipped to and installed in Louisiana. In fact, Lifetime sent a letter directly to Austin in Louisiana assuring Austin of the quality of the doors. Such certification on the part of Lifetime was a necessary prerequisite to approval by the Corps of the doors manufactured by Lifetime. The written representation by Lifetime evidences that Lifetime did engage in the kind of purposeful, deliberate activity contemplated by due process considerations. The acts performed by Lifetime outside the state—the manufacture of the doors—certainly had foreseeable consequences within the state. Lifetime's contacts with Louisiana cannot be considered merely fortuitous. The manufacturer did purposefully avail itself of the benefits and protection of the laws of Louisiana in the instant case.

The remaining elements of the due process examination "[require] us to consider such things as the interest of the state in providing a forum for the suit, the relative conveniences and inconveniences to the parties, and basic equities." *Product Promotions*, 495 F.2d at 498. Upon review of the record, these considerations lead to the conclusion that it is both fair and reasonable to require Lifetime to defend this suit in Louisiana.

Lifetime argues that *Benjamin v. Western Boat Building Corp.*, 472 F.2d 723 (5th Cir.), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973), a Louisiana diversity case, is dispositive of the jurisdictional issue in this case and mandates a contrary result from that reached by the district court. We disagree. In *Benjamin*, the nonresident defendant, Western Boat, was a foreign boat building corporation that had (1) submitted a construction bid on a vessel by mail from Washington to a Louisiana resident (Benjamin) at his part-time home in North Carolina, (2) signed the construction contract in Washington and returned it to Benjamin in North Carolina, (3) constructed the vessel in Washington, and (4) received Benjamin's payment for the vessel and delivered the vessel to Benjamin in Washington. During construction, correspondence was exchanged between Western Boat and Benjamin, some of which came from and was sent to Louisiana. After Benjamin accepted delivery and took possession of the vessel, it was homeported in New Orleans. Benjamin had sailed the yacht for nearly ten years when it was discovered that the hull had corroded. Benjamin contacted Western Boat and was referred to a Seattle firm to gauge the vessel's plating. Several months later, Benjamin complained to Western Boat of irregularities in the construction of the vessel, and Western Boat arranged for an independent Louisiana firm to inspect the vessel. The Louisiana firm acted as an independent contractor and not as an agent of Western Boat or in an employee capacity. The Court of Appeals held that the exercise of in personam jurisdiction over Western Boat did not meet due process standards since "Western Boat's activity, if any, in Louisiana never achieved the sufficiency necessary to satisfy the 'minimum contacts' requirement of constitutional due process." 472 F.2d at 731.

The nature and quality of Lifetime's contacts with the forum state differ significantly from those of Western Boat. The contacts between Lifetime and the forum state in the case before this Court are more direct and more substantial than those in *Benjamin*. Lifetime unquestionably knew

---

**16.** The Supreme Court recently addressed the notion of foreseeability required by due process in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In discussing the foreseeability requirement, the Court stated:

But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.
*Id.* at 567.

that the doors it manufactured were to be used in a housing facility in Fort Polk, Louisiana. In fact, Lifetime took direct action to ensure that the Corps of Engineers would approve the use of these doors in its housing facility: Lifetime sent to Austin in Louisiana a written representation certifying the quality of the doors. By this action, Lifetime knowingly solicited a market for its products in Louisiana.

*Benjamin* did not hold that a single sale—when the defendant has no additional contacts with the forum unrelated to the lawsuit—could never provide sufficient contacts with the forum to allow the exercise of in personam jurisdiction. Instead, it was the *Benjamin* Court's considered judgment that the contacts were constitutionally insufficient in that case. The constitutional test for evaluating the exercise of personal jurisdiction requires "weighing and balancing the relevant considerations. Here, as elsewhere, important constitutional questions prove themselves immune to solution by checklist, and each case must be decided on its own facts." *Product Promotions*, 495 F.2d at 499. In view of Lifetime's certainty that the doors would be used in Louisiana and the written representations it sent directly to Austin in Louisiana, we are compelled to conclude that Lifetime has purposefully availed itself of the benefits and protections of Louisiana law and is subject to personal jurisdiction there in this case.

Moreover, since this Court decided *Benjamin*, the Supreme Court has seemingly approved the exercise of personal jurisdiction in the kind of situation involved in this case. In *World-Wide Volkswagen Corp. v. Woodson*, 100 S.Ct. 559, 567 (1980), the Supreme Court stated: "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." In the case before this Court, Lifetime did not just engage generally in delivering these doors into the stream of commerce; rather, it sold the doors specifically for use in the Louisiana housing facility. Moreover, Lifetime

did not merely have an "expectation" that the doors would be purchased by a Louisiana consumer—Lifetime had absolute knowledge (as evidenced by the written representations Lifetime sent to Austin) that the doors would be purchased by a Louisiana consumer and installed in a Louisiana housing project. Under these circumstances, the district court's exercise of personal jurisdiction was proper.

We have considered and found meritless all remaining arguments raised by appellants. Inasmuch as the district court made no reversible error in its findings of fact and conclusions of law, the judgment of the district court is

AFFIRMED.