John A. COCHRAN, Plaintiff,

v.

ROCKWELL INTERNATIONAL CORPO-
RATION; North American Rockwell
Corporation; and Ayres Corporation, all
foreign corporations, Defendants.

Civ. A. No. DC 81–61–WK–P.

United States District Court,
N.D. Mississippi,
Delta Division.

May 12, 1983.

Robert Lawson Holladay, Drew, Miss., for plaintiff.

William E. Suddath, Jr., Jackson, Miss., for Rockwell.

William H. Cox, Jr., Jackson, Miss., for Ayres.

## MEMORANDUM OF DECISION

KEADY, District Judge.

In this non-jury action, plaintiff, John A. Cochran, a citizen of Mississippi, sues defendants, Rockwell International Corporation and North American Rockwell Corporation (Rockwell), foreign corporations organized under Delaware law, and the Ayres Corporation (Ayres), a corporation organized under Georgia law, on a products liability claim that an Aero Thrush Commander airplane manufactured by Rockwell and later sold by Ayres as distributor, caused personal injury to him as a pilot because of defect in manufacture existing at the time of sale to the user. After a two-day evidentiary hearing, at which both sides presented oral and documentary evidence, the court heard oral argument, considered proposed findings of fact and conclusions of law, and herewith makes findings of fact and conclusions of law as follows.

### I. *Facts*

Rockwell, in the fall of 1973, manufactured at its plant in Albany, Georgia, the subject airplane known as a Rockwell Thrush Model SR–2, serial number 1842, a single-engine aircraft especially designed and equipped for agricultural aerial applications. After multiple inspections during manufacture, flight tests, and FAA certification, the aircraft was sold and delivered to Ayres, which was a Rockwell Thrush distributor, at Ayres plant in Albany, Georgia.

On November 30, 1973, Ayres sold the aircraft to Ralph M. Sharpe, who was engaged in the crop dusting business known as Tunica Air Service at Tunica, Mississippi.

Sharpe took delivery of the Thrush at Albany, Georgia, flew it to Mississippi and almost immediately placed it in service in his crop dusting operations.

Plaintiff, who was experienced in crop dusting flights, was employed by Sharpe, and was assigned the job of piloting the subject aircraft. On March 21, 1975, plaintiff, flying alone, left the Tunica Air Service airstrip in the Thrush with a load of ammonia nitrate for spraying on a wheat field several miles away. He took off at approximately 2:30 P.M. with a 15 mph wind out of the south, maneuvered the plane from south to west when, about 100 feet above ground, he experienced a sudden loss of engine power. Plaintiff immediately took an emergency procedure by dumping the load of chemical and looked for a place to land. He decided to land northbound in a field marked by two ditches filled with water. The Thrush had a conventional landing gear, known as a tail dragger. As the front wheels or forward landing gear touched down, the plane had a speed of about 95 mph and landed on a field softened from recent rains. Plaintiff described his landing as one with the rear landing gear, or tail wheel, still in the air, and the right forward wheel struck a mud hole which veered the aircraft to the right. No one on the ground witnessed the actual landing. The extent of the turn made by the Thrush is somewhat in dispute. Plaintiff testified that the plane went almost 270° to the right and the aircraft was headed southwest as it came to a halt. In his pretrial deposition, plaintiff stated that his turn was 80° but insisted that this was an error that he failed to correct upon reading the deposition. Sharpe, who arrived within minutes after the landing, testified that the plane moved no more than 80° from a northerly heading, and it was then facing east. When the plane halted, however, the engine was running and did not die out. After getting out of the cockpit, plaintiff as well as Sharpe carefully checked the aircraft to ascertain that no damage of any kind had occurred. At Sharpe's direction, plaintiff re-entered the plane, revved up the

engine and flew the Thrush back to the airstrip.

In an effort to determine what caused the power loss, Sharpe engaged aircraft mechanics who disassembled the engine parts, including a "header" tank which connected with two wing tanks and was installed under the fuselage. With FAA personnel present, the mechanics discovered inside the header tank several pieces of masking tape and a red thread plastic guard, or thimble. The foreign objects were loose inside the tank and made a rattling noise when the header tank was shaken after being emptied of fuel and disconnected from the plane. These foreign objects were the kinds of materials that Rockwell used in the manufacturing process, and were in the header tank at the time it was installed on the Thrush at Rockwell's plant, and hence in the tank at the time of the aircraft's sale first by Rockwell to Ayres and then by Ayres to Sharpe.

The presence of the foreign matter in the header tank interfered with the free and normal flow of fuel through the aircraft's fuel system and constituted a defect which rendered the Thrush dangerous for normal use. On a prior occasion, the subject aircraft, when flown by Billy Paul, another Sharpe pilot, demonstrated engine weakness which almost caused Paul to make a forced landing. Since the plane functioned properly at other times during the 1973–74 crop dusting season, however, Sharpe had taken no earlier action to have the aircraft disassembled or repaired. In fact, the aircraft was in the same unchanged condition on March 21, 1975, as it was when it was manufactured by Rockwell and sold by Ayres to Sharpe.

The dominant factual issue is whether plaintiff was at all injured in the forced landing. Most of the testimony in the case was directed at that question. According to plaintiff, when the front wheels contacted the ground, the Thrush "ground looped," or pivoted on the right wheel, which swung the left wing around to the right and reversed the direction in which the aircraft had been headed. During this emergency,

plaintiff was fastened in his lap seat belt but did not have his shoulder harness connected. He was seated next to a window, or door, made of thin plexiglass only inches from his left shoulder. Certain physical evidence, or lack of it, is significant. No part of the plexiglass or door stripping, was bent or broken in the forced landing. The underside of the left wing tip and the chemical spray bar underneath the left wing were not marked by grass stain, mud or dirt. No debris was observed on or along the edges of the left tire and rim. The oversized balloon tires, mounted on the Thrush to enable it to land and roll upon field surfaces, as well as on established runways, left no heavy imprint or mark on the ground where the plane landed. As plaintiff observed in his testimony, the rear tail wheel made no track at all until the plane came to a dead stop.

Plaintiff asserts that he sustained a physical injury in the forced landing that has resulted in his having episodes of chronic back trouble. He recalls that, since the shoulder harness was disconnected, he felt the left side of his body snap with the lurching of the plane and this caused him neck pain. He did not mention it to Sharpe or others at the scene. Plaintiff finished the day's work, but said the crick became worse that night and he soon began sleeping on a hot pad. He stated he later went to see Dr. Addington, who has since died, but admits a year elapsed before he saw another physician, Dr. George Jones, who referred him to Dr. Morris Ray, of Memphis, Tennessee, a neurosurgeon, whose findings will be later discussed.

Meanwhile, plaintiff continued working as a crop duster without interruption, flying a regular schedule for Sharpe until leaving his employment in June 1975. At no time did plaintiff inform his employer that he was hurt in the forced landing, nor make a workmen's compensation claim on account of the incident. In late 1975, Sharpe filed a claim against Rockwell for the value of the chemicals dumped and the lost down-time of the Thrush during the inspection and repair period. Though

aware of this, plaintiff made no complaint of personal injury until the present suit was filed nearly six years after the incident. Instead, he entered the crop dusting business in his own name, as Sharpe's competitor, substantially expanded the size of his farming operations, and also entered the sheet metal business. Thirty-two years of age in March 1975, plaintiff every year since has flown an average of 350 hours per season in agricultural spraying, and as the need arose, operated farm tractors and other equipment, as well as doing work largely of a supervisory nature. Claiming no loss of earnings due to back ailment, plaintiff concedes his income has in fact increased annually since 1975. He testified at length, however, as to activities restricted because of the painful condition of his back, such as an inability to lift heavy objects weighing more than 50 pounds, or do the vigorous chores that he formerly did, or to engage in outdoor sports and other recreational activities. Plaintiff's family, employees and other witnesses confirm his present complaints about persistent back pain and his inability to engage in arduous work.

Plaintiff stated that he believed that his back claim against Rockwell and Ayres was barred by the statute of limitations until he was, just prior to filing suit, advised by a fellow aviator that Mississippi had a six-year statute of limitations that might apply. Since it is apparent that plaintiff has somewhat belatedly associated his present back condition with the March 21, 1975, incident, the court has paid close attention to his known history of accidents in cars or trucks, as well as in airplanes, and the record of medical examinations and findings, before and after March 21, 1975.

In 1958, when he was seventeen, plaintiff had an automobile wreck that caused him to have neck pain and required treatment by Dr. Ray, the neurologist. Also, plaintiff has long suffered, well before 1975, from migraine headaches, felt to be of vascular origin. In 1971, Dr. Edward Kaplan, also a Memphis neurologist, first saw plaintiff for neuralgia of the left face, and placed him on medication. The same symptoms returned in 1974. Plaintiff then reported to Dr. Kaplan a history of daily recurrent headaches. Dr. Kaplan did not again see plaintiff until March 18, 1976, or one year after the forced landing incident, when plaintiff had complaints of tingling in the legs and back pain allegedly related to the forced landing. Kaplan's 1976 examination did not reveal any muscle spasm, tenderness, or limitation of motion of the lumbar spine. Neurological reflexes were normal, and x-rays revealed no fractures or bone abnormalities. Kaplan examined plaintiff again in August, 1976, with a complaint of headaches and vomiting, but no back pain. Kaplan's neurological examination was normal, and plaintiff made no follow-up visits to this specialist.

In December 1978, plaintiff was seen by Dr. Arnold Drake, a Memphis internist, with complaints of increasing abdominal pain that rendered him unable to sleep at night. Plaintiff did not advise the internist that he had back pain. Plaintiff informed Dr. Drake that he suffered pain in the area of the breast bone, mostly at night, almost daily since 1969, and had been hospitalized for twenty-one days in 1973 for chest pain for a diagnosed ulcer. Dr. Drake's impression was that plaintiff's chest pain was due to an esophageal hiatal hernia and a spastic colon. When plaintiff related to Dr. Drake that he had "crash landed" an airplane in 1975, and snapped his neck and low back that caused pain, Drake referred him to Dr. Kaplan for neurological re-evaluation. Such were the circumstances under which Dr. Kaplan saw plaintiff the third time on October 30, 1980. X-ray examinations then made of the thoracic and lumbar spine were normal and revealed no fractures. The neurological examination by Dr. Kaplan showed no muscle spasm, tenderness, or limitation of motion in the back. Plaintiff did not return for a follow-up visit.

After the March 21, 1975, incident, plaintiff had two automobile accidents, the first occurring in 1979 when the pickup truck he was driving slid into a ditch and turned over against the passenger's side, and the second happening in 1980 when the other vehicle that collided with his car turned

over. On February 26, 1981, plaintiff made a forced landing in another airplane after the engine stalled and the plane, upon touching down, turned completely over on the wings. The aircraft was a total loss. Alone in the plane, plaintiff was left hanging in the harness and he had to cut himself loose from it; this caused him to fall several feet on his head. Though seen by a physician who took x-rays, plaintiff disclaims any known injury from the trauma of the subsequent occurrences.

At trial, plaintiff relied principally upon the expert opinions of Dr. McClure, an orthopedist, and Dr. Kaplan. Dr. McClure, who first examined plaintiff on March 5, 1981, took x-rays that showed healed fractures at several locations of the transverse processes of the lumbar spine that had not been revealed on prior x-ray examinations. The orthopedist stated the fractures could have healed anywhere from four to six weeks up to several years. McClure was of the opinion, based on the history he obtained from plaintiff, that plaintiff had a mild degenerative lower lumbar disk or disks which he attributed to the March 21, 1975, incident. Dr. McClure was of this view since plaintiff reported that he had not experienced prior back pain. Plaintiff did not inform Dr. McClure of the inverted airplane landing that occurred one month before the examination, nor of the 1979 accident of the truck turning on its side. On cross-examination, Dr. McClure acknowledged either of those events, or steady flying a crop dusting plane and thereby putting double gravity or weight on the pilot's body might well be responsible for plaintiff's back ailment. Dr. McClure concluded by stating he was unable to say with reasonable medical certainty what was the cause of plaintiff's symptoms at his March 5, 1981, examination. (McClure deposition, pp. 17–18, 22).

Dr. Kaplan, in deposition testimony, stated that he last examined plaintiff on October 30, 1980, when he concluded that plaintiff probably had a cervical and lumbosacral strain which, on the history told to him by plaintiff, was attributable to the 1975 forced landing. He explained that soft tissue damage to muscle and ligaments that cause neck and back pain is not revealed by x-ray. He reconfirmed that plaintiff's neurological examination showed no muscle spasm, tenderness, or limitation of motion at any examination that he conducted. On cross-examination, however, Dr. Kaplan stated that ordinarily he would expect plaintiff to be more prominently manifesting symptoms of back pain in the August 1976 examination than a year later, October 30, 1980, had the strain been caused by trauma of the 1975 forced landing. The specialist, too, acknowledged that it was difficult to correlate plaintiff's back strain with any particular trauma since "a lot of time had passed and a lot of events had passed between the alleged injury and the time I saw him in 1980." (Kaplan deposition, pp. 19–20). This statement was made by Dr. Kaplan after he was correctly informed that plaintiff had been in a truck accident in 1979, had continued to fly regularly as a crop duster, pulling two G's in making turns, and had also operated a farm tractor on occasions.

The correct evaluation of the medical evidence has been made difficult because of plaintiff's failure to give his physicians accurate accounts of his significant accidents after March 1975 and of his vigorous activity schedule after that date to enable them to reach more certain conclusions as to medical causation. This leaves the court, as the trier of fact, to weigh the testimony of plaintiff, his family, and other lay witnesses against plaintiff's post-1975 accidents involving the pickup truck and inverted airplane crash and strenuous work history as likely candidates, singly or collectively, to cause plaintiff to suffer chronic back trouble. Additionally, we find that all of the physical evidence as to the condition of the plane and the ground after plaintiff ground looped upon landing negates plaintiff's claim that the aircraft lurched to the right violently, or caused any significant trauma to his body. Ground looping often occurs upon landing when an aircraft is not kept straight on the ground, and ordinarily causes no harm to the pilot.

From the whole evidence, the court is unable to determine what event or events triggered the onset of plaintiff's back pain. Because of this fact, plaintiff has failed to carry his burden of proving by a preponderance that he in fact sustained personal injury proximately related to the incident that he complains of in this action.

## II. *Law*

■ This court has undoubted jurisdiction in view of the diversity of citizenship of the parties and requisite amount in controversy. The case is controlled by well-settled principles of law. It is evident that Mississippi is the jurisdiction having the most contacts with the parties since the plaintiff is a resident of, and sustained the incident complained of, in this state and defendants anticipated that the Thrush aircraft would be used in Mississippi crop dusting operations. Hence, under the center of gravity doctrine recognized in Mississippi, *Mitchell v. Craft,* 211 So.2d 509 (Miss.1968), the substantive law of that jurisdiction controls the rights and obligations of the parties.

■ Initially, we dispose of the defenses of limitations and laches raised by Rockwell. Neither defense is well taken. Having found that the forced landing incident occurred on March 21, 1975, plaintiff's action, though not filed until March 17, 1981, was nevertheless instituted four days prior to the expiration of the State's six-year statute of limitations, Miss.Code Ann. § 15–1–49 (1972), applicable to this case. Nor has Rockwell or Ayres been prejudiced or changed its position by the mere lapse of time on plaintiff's part in commencing suit so as to make laches apply.

Looking at the merits, the court holds that, assuming injury to the plaintiff, a case of strict liability in tort against Rockwell has been made out under *State Stove Manufacturing Company v. Hodges,* 189 So.2d 113 (Miss.1966); *Ford Motor Company v. Matthews,* 291 So.2d 169 (Miss.1974), and their progeny, under well-known principles enunciated in § 402A in Restatement (Second) of Torts. The aircraft, by reason of foreign objects left in the header tank

that impeded the flow of fuel to the engine, was rendered defective and dangerous for ordinary use by a pilot in normal flight operation. Undisputedly, the defective condition was present in the aircraft at the time of its manufacture and later sale, and the aircraft reached the user without substantial change in its original condition.

■ As to the defendant Ayres, we agree that § 402A strict liability does not apply, since it neither manufactured or processed any part of the aircraft nor did it represent the aircraft as one which it made. Moreover, Ayres had no legal duty or obligation to re-inspect the header tank or the Thrush's fuel system as a check upon Rockwell's workmanship. Nevertheless, since Ayres regularly engaged in the sale of Thrush aircraft, it must be deemed a merchant of such personal property. In that capacity, it is evident under the Mississippi Uniform Commercial Code, Ayres extended an implied warranty of merchantability that the aircraft was fit for the ordinary purposes of its use. Miss.Code Ann. § 75–2–314(2)(c) (1972). It proved to be unmerchantable. In view of Ayres' policy of advertising the merits of Thrush airplanes for crop dusting operations and its prominence as a Rockwell distributor in the southeastern United States, it is implicit from the evidence that Sharpe, as the purchaser, relied upon Ayres' skill and judgment in making the purchase and that Ayres had reason to know of the particular purpose for which the Thrush was to be used. Thus, Ayres' sale also extended an implied warranty of fitness for a particular purpose, Code § 75–2–315. Because of the defective condition of the Thrush which rendered it unsuitable for normal use as an airplane as well as unfit for particular use as a crop duster, Ayres breached implied warranties existing under Mississippi law. *R. Clinton Const. Co. v. Bryant & Reaves, Inc.,* 442 F.Supp. 838, 845–846 (N.D.Miss.1977); *Garner v. S & S Livestock Dealers,* 248 So.2d 783, 785 (Miss.1971). *Cf. Boeing Airplane Co. v. O'Malley,* 329 F.2d 585 (8th Cir.1964) (applying Pennsylvania law to sale of helicopter). Moreover, in Mississippi it should

be noted that the original limitation of the scope of third-party beneficiaries who might claim the protection of an implied warranty, which was originally restricted by § 75–2–318, and under which plaintiff could not qualify, was abolished in 1976. Chapter 385, General Laws of 1976, rather curiously carried as § 11–7–20 under the heading of Practice in Circuit Courts, and not as a part of the Uniform Commercial Code, unmistakably declares that "in all actions for personal injury ... brought on account of breach of warranty, including actions brought under the provisions of the Uniform Commercial Code, privity shall not be a requirement to maintain the action." Thus, plaintiff, as the user in his capacity as pilot-employee of Sharpe, Ayres' purchaser, is entitled to sue Ayres as seller for breach of implied warranty.

█ The court next notes the demand of plaintiff's counsel that punitive damages should be awarded against Rockwell because of manufacturing a defective and dangerous airplane. During trial, the court ruled that plaintiff failed to adduce evidence which would render admissible Rockwell's net worth as reflected in recently published financial statements and excluded such evidence. The court reiterates its belief in the correctness of this ruling. Plaintiff offered no evidence that Rockwell had specific knowledge that the foreign objects were left in the aircraft during the manufacturing process at Rockwell's plant. Nor is there evidence that Ayres as seller was aware of the defective condition of the aircraft. On the other hand, Rockwell's uncontradicted testimony, corroborated by documentary evidence, was that the fuel system of the aircraft was subjected to many inspections during manufacture and the plane was fully tested on the ground and in the air by test pilots who went through virtually every conceivable maneuver before releasing the airplane for sale. Under these circumstances, there has been no factual issue raised as to gross, wilful or wanton negligence or other misconduct on the part of Rockwell or Ayres. We conclude that it would be improper for the court to consider in this case, based solely upon strict liability in tort and/or breach of warranty, an award of punitive damages.

█ Obviously, the only issue which the court has found difficult to decide relates to the simple question of whether plaintiff sustained personal injury in making a forced landing in a defective aircraft. The nature and quality of the evidence, especially the critical testimony of medical experts, lacks such force as to convince us as the trier of fact that plaintiff has met the burden of showing by a preponderance of the evidence that personal injury was proximately caused by the incident. Even though all other elements of proof are present, injury, of course, remains an essential ingredient to plaintiff's claim against either or both defendants. As revealed in the court's findings of fact, it is possible, or conceivable, that plaintiff may have hurt his back in the incident as he believes he did, yet it is equally possible that other trauma and/or activity entirely disassociated from the March 21, 1975, forced landing has caused his painful back. It is well settled in Mississippi and generally that "a verdict may not be based on surmise or conjecture, and that to prove a possibility only is insufficient to make [factual] issue." *John Morrell & Company v. Shultz,* 208 So.2d 906, 907 (Miss.1968). The scintilla of evidence rule is not in effect in Mississippi or in the federal courts. *Palisi v. Louisville & N.R. Co.,* 226 F.Supp. 651 (S.D.Miss.1964), *aff'd,* 342 F.2d 799 (5th Cir.), *cert. denied,* 382 U.S. 834, 86 S.Ct. 80, 15 L.Ed.2d 78 (1965). The court concludes that in this case it is not possible to make a finding that plaintiff sustained personal injury attributable to the forced landing complained of without resort to surmise, conjecture and speculation. This conclusion requires the court to find for the defendants and against the plaintiff.

Let an order issue accordingly.